**Oluwole Ajayi GABRIEL, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 14–08–00037–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

May 21, 2009.

Donald A. Hecker, Stafford, for appellant.

Kirsten E. Moore, Richmond, for state.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and SEYMORE.

## OPINION

JOHN S. ANDERSON, Justice.

A jury found appellant guilty of theft of $200,000.00 or more and the trial court assessed punishment at forty-five years' confinement in the Texas Department of Criminal Justice Institutional Division. Appellant raises four issues on appeal. In his first three issues, appellant contends the trial court erred in denying his motion to suppress because (1) evidence was obtained in violation of his Fourth Amendment rights when police officers conducted a warrantless search of garbage left outside his residence, (2) evidence was obtained in violation of his Fourth Amendment rights when police officers conducted a warrantless search of his private postal box, and (3) the search warrant issued to search his residence and vehicles was not supported by probable cause and therefore the search violated his Fourth Amendment rights. In his fourth and final issue, appellant contends the trial court erred in overruling his motion for a directed verdict on the issue of venue and furthermore, the jury's verdict is not supported by a preponderance of the evidence on the issue of venue. Finding no error, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from an elaborate scheme of theft primarily involving the use of fraudulently obtained credit cards. Over the course of approximately nine months, appellant submitted credit card applications to J.P. Morgan Chase Credit Services using phony names and fake social security numbers.[1] Upon receiving the false applications, Chase would issue a credit card and create an account based on the false name and social security number. Appellant used various addresses, including some postal boxes, as the home address on the application. Appellant would then receive the credit cards in the mail and would use them to make cash withdrawals, purchases, and balance transfers to other false accounts. Appellant rarely

---

1. This is not a case of identity theft, although some of the names and social security numbers used to obtain the accounts may be those of real persons, appellant did not specifically target real persons.

paid off the credit cards and when he did, he used a bad check, which was subsequently dishonored by the issuing bank. Appellant had numerous accounts open at one time and was constantly applying for and opening new accounts, while other accounts were being closed off as a loss by Chase. In the end, Chase calculated its loss from the fraudulent accounts as somewhere over $200,000.00.

This web of theft was discovered when analysts at J.P. Morgan Chase Credit Services noticed a trend of credit card fraud involving multiple accounts. The Senior Regional Investigator for J.P. Morgan Chase, Russell Locke, was alerted of the trend and took over the investigation. Locke testified the trend originally involved approximately forty accounts suspected of being fraudulent, all linked by common factors. The analysts initially became suspicious of the accounts when they determined many of the names on the accounts did not match up with the social security numbers on the accounts. Locke began further investigation on the accounts and found they were all linked to various addresses in Katy, Bedford, Dallas, and Fort Worth, Texas. Locke compiled a report including the names of the card holders on the suspicious accounts, the information on the applications for the accounts, and statements showing transactions conducted on each account. The majority of the transactions were either balance transfers or cash advances made at ATM machines. Many of the accounts included in the report were registered to similar names, often varying between different first letters of similar last names or different combinations of the same first and last names. Additionally, at least thirty of the forty suspicious accounts had

been "charged off" as a loss by Chase. Locke testified that a "loss account" is an account on which payments have stopped and the financial institution is forced to close the account at a loss.

Upon further investigation, Locke discovered approximately forty more loss accounts linked with the original trend. Additionally, a single telephone number was traced to thirty separate accounts by a computer program that captures a caller's telephone number when a balance inquiry is made on an account. One of the accounts linked to the telephone number was registered under appellant's name and the suspicious telephone number was listed as his home telephone number. Ultimately, J.P. Morgan Chase suffered a loss of $306,357.46 over a period of nineteen months. Sometime in December 2005, Locke turned his reports over to Detective David Schultz of the Fort Bend County Sheriff's Office.[2]

Detective Schultz is the Sergeant of the Organized Crime Unit in the Fort Bend County Sheriff's Office and in that role he supervises the financial crimes section. When Detective Schultz received Locke's report, he immediately noticed four of the addresses in the report were located in Fort Bend County. One of the four Fort Bend County addresses was identified as a commercial mail receiving agency, known as The UPS Store. Detective Schultz went with two of his partners and a U.S. Postal Inspector, Robert Fisher, to The UPS Store to determine who was registered on the postal boxes. At The UPS Store they looked at the applications for postal boxes # 510 and # 429, two of the postal boxes identified in the report compiled by Locke. One of the boxes was

**2.** Locke did not specifically testify why he decided to alert Fort Bend County, as the accounts were linked to addresses in many counties across Texas. However, there were a substantial number of accounts tied to the Fort Bend County area.

registered to appellant and the other to his wife.

While at The UPS Store, Fisher obtained permission from The UPS Store manager to make xerox copies of the outside of the mail in appellant's postal box. The names of the addressees on the mail were the same names listed on the fraudulent Chase accounts. The mail was not opened by Detective Schultz or any of the other investigators. After making copies of the face of the mail, the mail was returned to appellant's postal box. The parties stipulated during the suppression hearing that The UPS Store was set up so the manager and employees of the store had unfettered access to the back of the postal boxes, while the front of the postal boxes could only be opened by a key which is given to the renter. It is not clear from the record whether the mail was retrieved from the back or front of the postal box, but it does not appear anyone other than appellant or his wife had a key to the postal box.

Detective Schultz used the name on the postal box applications to conduct a search in the Fort Bend County property records.[3] Eventually, Detective Schultz identified a residence in Fort Bend County owned by Gabriel A. Michaels, a variation of appellant's name and one of the names used on the fraudulent accounts. The address of the residence was also one of the addresses connected with the fraudulent accounts. Detective Schultz and the other officers working on the case decided to conduct surveillance on the residence and a trash pickup. After a month of surveillance on the residence, the detectives determined appellant, his wife, and three children were the occupants of the residence. Additionally, the detectives observed three vehicles at the residence, a Nissan Armada, a black Mercedes, and a champagne colored Lexus. When Detective Schultz ran a license plate check on the vehicles he found they were registered to: Gabriel O. Ajayi, Gabriel O, Ajayi, and Gabriel A. Michaels, respectively.

Detective Schultz decided to contact J.P. Morgan Chase Bank and Bank of America, to determine whether they had photos or videos from their ATM machines that could have recorded the individual using the fraudulent credit cards. Both banks were able to find the videos from the specific fraudulent transactions and forwarded them to Detective Shultz. The videos displayed a man similar in appearance to appellant in vehicles similar to the vehicles identified as belonging to appellant. These photos supported Detective Schultz's belief appellant was the orchestrator of the fraudulent scheme.

In January 2006, two trash pickups were conducted at appellant's Fort Bend residence. The garbage collection crew along with one Fort Bend County detective collected appellant's trash from its ordinary location outside appellant's home. After the trash was collected from appellant's home it was unloaded from the garbage truck and placed in an unmarked police vehicle to transport back to the police station for inspection. At the station, the detectives found three shredded credit cards, one being a Chase card connected with the fraud scheme. They also found numerous pre-approved offers from credit card companies, letters of correspondence from credit card companies, and credit card statements all addressed to the names on the fraudulent accounts. These

---

**3.** Detective Schultz also ran a driver's license search on the names and obtained a copy of appellant's driver's license. However, appellant listed The UPS Store address as his address on his driver's license.

documents were entered into evidence at appellant's trial.

Three days after the trash pickup Detective Schultz prepared an affidavit to obtain a search warrant for appellant's residence and vehicle. Detective Schultz explained in great detail every step of the investigation leading him to appellant, his residence, and his vehicles. The magistrate issued the search warrant and the Fort Bend County Sheriff's office timely executed it. Inside the house they found documents identifying appellant and his wife, such as passports, identification cards, and driver's licenses. The detectives also found checkbooks in different names, credit cards in different names, many of the names matching those of the fraudulent Chase accounts. There was also an empty checkbook with check stubs showing checks written to names matching those names on the fraudulent accounts. Additionally, spiral notebooks were found with hand written information appearing to pertain to credit card accounts. There were names, dates of birth, pin numbers, account numbers, social security numbers all spanning numerous notebooks. Much of the information found in the notebooks matched up with the Chase fraudulent accounts.

Appellant was charged with aggregated theft of $200,000.00 or more. The jury found appellant guilty as charged in the indictment. The trial court set his punishment at forty-five years' confinement. This appeal followed.

## DISCUSSION

### I. Did the Trial Court Err in Denying Appellant's Motion to Suppress?

Appellant argues the trial court erred in denying his motion to suppress evidence seized from a search of his garbage, a search of his private postal box, and a search of his residence and vehicles pursuant to a search warrant. Specifically, appellant contends the warrantless searches of his garbage and private postal box were in violation of his Fourth Amendment rights. He also contends the search of his home and vehicles violated his Fourth Amendment rights because the search warrant was not supported by probable cause.

### A. Standard of Review

We review a trial court's decision to grant or deny a motion to suppress under an abuse of discretion standard. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App.1996). At a suppression hearing, the trial judge is the exclusive trier of fact and judge of the credibility of the witnesses. *See id.* An appellate court affords almost total deference to a trial court's determination of the historical facts supported by the record, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). The appellate court also affords the same amount of deference to a trial court's ruling on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those questions turns on an evaluation of credibility and demeanor. *Id.* An appellate court must view the record evidence and all reasonable inferences therefrom in the light most favorable to the trial court's ruling, and must sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Villarreal*, 935 S.W.2d at 138. This court reviews *de novo* those questions not turning on credibility and demeanor. *Guzman*, 955 S.W.2d at 89.

### B. Analysis

The critical question in determining a suppression issue is whether the

criminal defendant had a legitimate expectation of privacy in the area searched or items seized. *See Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 429, 58 L.Ed.2d 387 (1978). The capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place, but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place. *Id.* at 143, 99 S.Ct. at 430.

■ The accused, because he has greater access to the relevant evidence, has the burden of proving facts establishing a legitimate expectation of privacy. *Villarreal*, 935 S.W.2d at 138. To carry this burden, the accused must normally prove: (a) that by his conduct, he exhibited an actual subjective expectation of privacy, i.e., a genuine intention to preserve something as private; and (b) that circumstances existed under which society was prepared to recognize his subjective expectation as objectively reasonable. *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979)).

**1. The trial court did not err in denying appellant's motion to suppress evidence seized from appellant's garbage.**

■ In his first issue, appellant argues the trial court erred in denying his motion to suppress evidence seized from his garbage. The United States Supreme Court has held individuals cannot reasonably claim an expectation of privacy in trash left for collection. *California v. Greenwood*, 486 U.S. 35, 40–42, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988); *Nilson v. State*, 106 S.W.3d 869, 872 (Tex.App.-Dallas 2003, no pet.). The Court held that by placing garbage out on the curb for the express purpose of conveying it to a third party, the trash collector, appellant failed to manifest a subjective expectation of privacy society would be prepared to accept

as objectively reasonable. *See Greenwood*, 486 U.S. at 40–41, 108 S.Ct. at 1629. The Court noted the trash collector himself could have sorted through the garbage, as well as animals, children, scavengers, and snoops. *Id.* at 40, 108 S.Ct. at 1628 In light of the public's access to another's trash, the Court concluded society would not accept as reasonable an expectation of privacy in one's trash left out on a curb. *Id.* at 41, 108 S.Ct. at 1629.

In the case at hand, appellant left his garbage out on the curb, similar to the appellant in *Greenwood*. Appellant did not go to any lengths to protect the privacy of his trash that would distinguish this situation from the one in *Greenwood*. Appellant has not alleged that he falls within any exception to the well settled law of *Greenwood*. Texas appellate courts have followed *Greenwood* and we will do the same. *See Nilson v. State*, 106 S.W.3d 869, 874–75 (Tex.App.-Dallas 2003, no pet.); *Serrano v. State*, 123 S.W.3d 53, 62 (Tex.App.-Austin 2003, pet. ref'd). Accordingly, appellant's first issue is overruled.

**2. The trial court did not err in denying appellant's motion to suppress evidence seized from appellant's postal box.**

■ In his second issue, appellant argues the trial court erred in denying his motion to suppress evidence seized pursuant to a warrantless search of his rented private postal box. Appellant contends he has an expectation of privacy in the postal box and therefore, his rights under the Fourth Amendment were violated.

Both parties concede there is no expectation of privacy in the exterior of an envelope while it is in the stream of commerce. However, the parties dispute whether an expectation of privacy attaches to the envelope, including its exterior, when the envelope is placed in a private

postal box. The State argues the expectation of privacy only extends to the contents of the envelope, regardless whether the envelope has been placed in a private postal box. Appellant compares the private postal box with a residence. He argues there is a legitimate expectation of privacy in the exterior of the letters placed in his postal box. Neither side cited a case directly on point.

The Fifth Circuit encountered a similar set of facts in *United States v. Osunegbu,* 822 F.2d 472 (5th Cir.1987). In that case, Osunegbu's husband rented a private postal box under a fictitious name. *Id.* at 474. Some local residents began complaining their mail was being forwarded to a private postal box. *Id.* The postal inspector went to the postal facility where the mail was being sent. *Id.* He asked the manager of the facility to show him the mail inside the postal box rented to Osunegbu. *Id.* The inspector did not have a search warrant. *Id.* The manager complied and allowed the inspector to look at the addresses on the letters and parcels. *Id.* The inspector did not open the mail, he only verified that the names on the letters matched the names of the complainants. *Id.* The inspector then set up surveillance at the postal facility and determined Osunegbu and her husband were the renters of the postal box. *Id.* Osunegbu argued the warrantless search of the postal box violated her expectation of privacy. *Id.* at 477.

The Fifth Circuit held the warrantless search of the mailbox was not violative of the Fourth Amendment rights of Osunegbu. *Id.* at 480. The court held the manager of the postal facility had authority as an agent to consent to the search of the mailboxes. In arriving at its decision, the court focused on the lay out of the postal facility. *See id.* The postal facility in *Osunegbu* is similar to the one involved in the current case. The front of the postal boxes could only be opened by a key, while the back remained open for workers at the postal facility to sort the mail and place it in the mailboxes. *Id.* The court emphasized that the manager had "complete and unfettered access" to the mailbox contents. *Id.* at 479. Additionally, the court noted the manager would have to reenter the mailbox from time to time to rearrange mail if bigger items needed to be placed in the mail box, or if mail was accidently placed in the wrong box. *Id.* at 479–80. The Fifth Circuit concluded because of the manager's unfettered access to the mailboxes he could effectively consent, as an agent, to an examination of the letters and parcels in the mailbox. *Id.* at 480.

We believe the Fifth Circuit's reasoning is persuasive and adopt its interpretation. The facts established regarding the search of the postal boxes in this case are substantially similar to the facts in *Osunegbu.* Appellant's postal box could only be opened in the front by a key, however the back remained open to The UPS Store employees. The manager of The UPS Store consented to the postal inspector's request to view appellant's mail by collecting the mail from appellant's postal box and copying the front of the envelopes for the inspector. We agree with the Fifth Circuit that the lay out of The UPS Store is a critical factor in finding the manager of the store had authority to consent to the search.

In addition to the lay out of The UPS Store, we believe the Form 1583, "Application for Delivery of Mail Through Agent" is evidence of the mailing center's authority to consent to a search of a rented postal box at its facility. Anyone renting a postal box at a commercial mailing center is required to fill out Form 1583 by the United States Postal Service.[4] In this case, the

---

4. USPS Domestic Mail Manual ("DMM") § 153.212 (incorporated by reference, 39

State entered into evidence Form 1583s signed by appellant and his wife. Specifically, the State provided a copy of the Form 1583 signed for both of the searched postal boxes. A copy of the completed form 1583 is filed with the United States Postal Service and another copy is retained by the commercial mail receiving agency, The UPS Store in this case. The form requires information such as the applicant's name, address, telephone number, and two forms of identification. Form 1583 designates the commercial mail receiving center as the customer's authorized agent for the receipt of mail. We conclude this agency relationship gives the mailing center the authority to consent to a search of its customers' postal boxes. The United States Supreme Court and our own Court of Criminal Appeals has held that a person with common authority over property may consent to a search of the property. *See United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *Patrick v. State*, 906 S.W.2d 481, 490 (Tex.Crim.App.1995).

We hold the agency relationship created by Form 1583 and the layout of The UPS Store are sufficient to grant the manager of the store authority to consent to a search of appellant's postal box. Accordingly, we overrule appellant's second issue.

**3. The trial court did not err in denying appellant's motion to suppress evidence seized pursuant to a valid search warrant.**

■ In his third issue, appellant argues the trial court erred in overruling his motion to suppress evidence obtained pursuant to a search warrant. Appellant complains the evidence in the affidavit supporting the search warrant is insufficient to create probable cause for the issuance of the warrant.

C.F.R. § 111.1 (2009)).

■ In Texas, the affidavit supporting a search warrant must state probable cause. *State v. Walker*, 140 S.W.3d 761, 765 (Tex.App.-Houston [14th Dist.] 2004, no pet.). To determine whether the facts alleged in an affidavit sufficiently support a search warrant, a magistrate or a court examines the totality of the circumstances. *Ramos v. State*, 934 S.W.2d 358, 362–63 (Tex.Crim.App.1996). The allegations in an affidavit are sufficient if they would "justify a conclusion that the object of the search is probably on the premises." *Id.* In determining the sufficiency of a search warrant affidavit, a reviewing court may consider only the facts found within the four corners of the affidavit. *Hankins v. State*, 132 S.W.3d 380, 388 (Tex.Crim.App. 2004). Nevertheless, the reviewing court should interpret the affidavit in a common sense and realistic manner, recognizing that the magistrate was permitted to draw reasonable inferences from the facts and circumstances alleged. *Id.*

■ Our scrutiny of the sufficiency of an affidavit, like the trial court's scrutiny, does not take the form of a *de novo* review; instead we determine whether the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *Walker*, 140 S.W.3d at 765. In conducting this review, we give great deference to the magistrate's determination of probable cause. *Ramos*, 934 S.W.2d at 363.

Appellant does not dispute the accuracy of the statements contained in the affidavit, he merely argues the facts alleged are not sufficient to create probable cause. Specifically, appellant claims photographs taken at the Chase ATM machines were of

such poor quality to be insufficient to put appellant in possession of the suspect credit cards. He also claims the evidence seized pursuant to the postal box search and garbage search is inadmissible because the seizure of such evidence was done in violation of his Fourth Amendment rights. As discussed above, neither the search of appellant's garbage, nor the search of his postal box was violative of the Fourth Amendment, and therefore, the fruits of such searches are admissible. Under the totality of the circumstances and in light of the fact the evidence seized from the garbage and postal boxes is admissible, we do not believe the magistrate's determination of probable cause was unreasonable. *See Ramos*, 934 S.W.2d at 363.

As to appellant's contention the ATM machine photos are insufficient, we believe there is enough evidence in addition to the ATM machine photos to find probable cause regardless. Detective David Schultz prepared the affidavit used to obtain the search warrant. Detective Schultz had personal knowledge of the facts stated in the affidavit from his ongoing investigation in this case. The affidavit illustrated the case from the beginning, explaining how Russell Locke compiled his expansive report showing the links between the fraudulent accounts. The affidavit contained copies of the applications for the postal boxes signed by appellant and his wife. It described how the Fort Bend County Sheriff's Office eventually identified appellant through his numerous driver's licenses under different aliases. Detective Schultz explained in the affidavit how he found the address of appellant's residence by running a search in the Fort Bend County property records on one of appellant's aliases. Detective Schultz also detailed how the Fort Bend County Sheriff's Office set up a trash pick up at appellant's house and found shredded credit cards and mail

relating to the fraudulent accounts in appellant's garbage. The affidavit included a list of the names found on the mail in appellant's mailbox, which matched up with the names on the fraudulent accounts. The affidavit is over thirty pages long and provides in great detail various different sources of evidence pointing to appellant's residence and vehicle as being places where further evidence of the elaborate fraud scheme could be found. Thus, it is entirely reasonable to conclude the magistrate had a substantial basis for finding the search warrant would uncover further evidence of theft. *See Walker*, 140 S.W.3d at 765. Consequently, appellant's third issue is overruled.

## II. Is the Evidence Sufficient to Support a Finding of Venue in Fort Bend County?

In his fourth issue, appellant challenges the sufficiency of the evidence supporting venue in Fort Bend County. Specifically, appellant argues the trial court erred in overruling his motion for an instructed verdict on the issue of venue and further contends the jury verdict is not supported by a preponderance of the evidence on the issue of venue.

### A. Standard of Review

The law is well settled that a challenge on appeal to the denial of a motion for directed verdict is a challenge to the legal sufficiency of the evidence. *Turner v. State*, 101 S.W.3d 750, 761 (Tex. App.-Houston [1st Dist.] 2003, pet. ref'd). When reviewing legal sufficiency, we view all the evidence in the light most favorable to the verdict and then determine whether a rational trier of fact could have found venue was proper by a preponderance of the evidence. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App.2007); Tex. Code Crim. Proc. Ann. art. 13.17 (Vernon

2005). The jury, as the trier of fact, is the sole judge of the credibility of witnesses. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988). The jury chooses whether or not to believe all or part of a witness's testimony. *See id.* We do not engage in a second evaluation of the weight and credibility of the evidence. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim.App.1993); *Harris v. State*, 164 S.W.3d 775, 784 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd). Thus, if there is evidence establishing venue by a preponderance, we are not authorized to reverse the judgment on sufficiency of the evidence grounds. *See Black v. State*, 645 S.W.2d 789, 791 (Tex.Crim.App.1983).

### B. Analysis

■ The general venue provision of Article 13.18 of the Texas Code of Criminal Procedure provides that "if venue is not specifically stated, the proper county for the prosecution of offenses is that in which the offense was committed." Tex. Code Crim. Proc. Ann. art. 13.18 (Vernon 2005). When several thefts are aggregated into a single offense under Section 31.09 of the Texas Penal Code, the proper county for prosecution under the "plain" language of Article 13.18 is any county in which the individual thefts or any element thereof occurred. *State v. Weaver*, 982 S.W.2d 892, 893 (Tex.Crim.App.1998).[5] Applying the "plain" language of Article 13.18 to this case, Fort Bend County is a proper venue for prosecution of all the thefts aggregated into the single offense alleged in the indictment. *See id.* There is no need for the State to prove the entire $200,000.00 or more was stolen in Fort Bend County, it is sufficient for the State to show only some of the aggregated thefts occurred in Fort Bend County.

The report compiled by Russell Locke included a list of transactions where the fraudulent credit cards were used. The report showed numerous ATM transactions on the fraudulent accounts in Fort Bend County. Additionally, there are photos of an individual looking similar to appellant in a vehicle registered to appellant's name at ATM machines in Fort Bend County. Thus, there is evidence appellant committed theft in Fort Bend County when he used the fraudulent credit cards to obtain cash advances from an ATM machine in Fort Bend County. Because appellant's thefts were committed pursuant to one scheme and continuing course of conduct, evidence of any theft or element thereof in Fort Bend County is sufficient to sustain venue in Fort Bend County. *See id.* A rational trier of fact could find venue in Fort Bend County by a preponderance of the evidence and therefore, the evidence is legally sufficient to support the jury verdict and the trial court's denial of appellant's motion for a directed verdict. *See Hooper*, 214 S.W.3d at 13. Accordingly, appellant's fourth issue is overruled.

### CONCLUSION

Having overruled all four of appellant's issues, we affirm the judgment of the trial court.

---

**5.** Appellant acknowledges *Weaver* is the controlling law, but contends the decision is "clearly wrong" and asks us to reject its reasoning. As an intermediate court of appeals, we are bound by controlling authority from the Court of Criminal Appeals and therefore cannot reconsider its holding as appellant requests. *Zarychta v. State*, 44 S.W.3d 155, 162 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd).