[No. G038778. Fourth Dist., Div. Three. Oct. 30, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
CUAUHTEMOC AGUSTIN REYES et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part IIB.–D.

## Counsel

William J. Kopeny & Associates and William J. Kopeny for Defendant and Appellant Cuauhtemoc Agustin Reyes.

Kristin A. Erickson for Defendant and Appellant Arthur Frank Zavala.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela Ratner Sobeck and Scott Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**ARONSON, J.**—A jury convicted Cuauhtemoc Agustin Reyes and Arthur Frank Zavala of kidnapping to extort a ransom. (Pen. Code, § 209, subd. (a); all further undesignated statutory references are to the Penal Code.) Reyes contends the trial court erred in denying his motion to suppress evidence, including the name of his cell phone carrier and records subsequently obtained from that carrier, after an employee at a private mail facility displayed to investigating officers the exterior envelope of a bill addressed to Reyes by the carrier. Reyes also challenges the admission of a lock pick set found in his possession, Zavala contests a pretrial photo identification as unconstitutionally suggestive, and both defendants contend the statutorily mandated life term for aggravated kidnapping amounts to cruel or unusual punishment under the California Constitution. As we explain, none of these contentions has merit, and we therefore affirm the judgment.

I

## FACTUAL AND PROCEDURAL BACKGROUND

Around 9:00 p.m. on November 16, 2001, 30-year-old Farsheed Atef exited an electronics store in Fountain Valley. As he placed his purchases in the trunk of his car, he noticed a white van parked in the adjacent stall, with its door open. A man approached Atef asking if he would like to view merchandise in the van and, when Atef rebuffed him, the man and a compatriot tried to abduct him. Atef broke free after a struggle and ran, yelling for help. The occupants of a silver, two-door Honda pulled alongside to offer their aid, and Atef clambered into that car through an open passenger window. The Honda sped off.

Atef realized he had been set up when his would-be rescuers ignored his pleas to take him to a police station and instead turned down a deserted road. Atef kicked the steering wheel, forcing the Honda to veer and collide with a pole. The white van approached and parked behind the Honda. Atef escaped from the Honda and tried to flee, but two men tackled him to the ground. They forced him into the back of the van, blindfolded him, and took his wallet and keys.

Despite his blindfold, Atef discerned that one man from the Honda joined the two in the van, which entered the 405 Freeway heading south. His abductors emptied his pockets, tearing to shreds anything they found. Atef was very frightened. The van left the freeway after about 10 minutes, and pulled into a parking lot. Another man, whom Atef later identified as Zavala, entered the van screaming that Atef had stolen money from someone and they were "here to get it back."[1] The van proceeded to another location, the parking lot of a Travelodge motel, where Zavala removed Atef's blindfold, showed him a photo album containing photographs of his business, residence, and family members, and threatened to harm Atef's mother if Atef did not cooperate.

The men walked Atef to a room in the motel, blindfolded him again, removed his shoes, and directed him to lie down on a bed. They disclosed he would be held until he withdrew $80,000 from his account the next day. His captors scoffed when he denied having such funds. Zavala attempted to verify the account balance, apparently telephonically, by using information on Atef's bank card and, when his attempts failed, he punched Atef in the head. Zavala

---

[1] Atef testified at trial he ran a computer consulting business in Tustin named DNA Micro and that, some time before the kidnapping incident, a former account manager, Anthony Tamraz, left DNA Micro on "bad terms," filing an $80,000 civil suit against Atef.

accused Atef of providing an inaccurate Social Security number, and ordered him to produce it again. Atef, though in great fear, retorted that he believed Tamraz was behind the kidnapping.

The kidnappers forced Atef to identify the key to his office on the key chain they had taken from him, and also extracted from him the alarm code for the office security system and the location of his checkbook there. Zavala, who had punched him, threatened him, and made most of the demands for financial information, forced Atef to swallow a pill that made him drowsy. Before falling asleep, Atef overheard his captors laughing, ordering a movie, discussing plans to obtain food and drugs, and he heard sniffing or snorting sounds as if they were using cocaine.

When Atef awoke early the next morning, Zavala was gone. Atef attempted to persuade his two remaining captors that the court had ruled the $80,000 was his and they should stop their involvement and free him. Zavala returned. Handing Atef a cell phone and dialing Atef's business, Zavala ordered Atef to obtain his business account number from his brother, Saeed. Atef complied without mentioning the kidnapping to Saeed. Dialing Atef's bank and again proving unable to obtain the account balance, Zavala became angry and punched Atef in the head. Zavala redialed Saeed, this time using the speaker function of the motel phone. Atef reobtained the number from Saeed, and Zavala was able to call the bank and determine Atef's account balance was $44,000.

Zavala told Atef they were taking him to the bank to withdraw the money and, if he did not comply, they would frame him for bank robbery. Zavala instructed Atef to write a note on an envelope stating, "I'm here to rob the bank. I hold anthrax in an envelope, so do not scream, and put money in a bag." Zavala furnished Atef with an envelope containing white powder. Loading Atef into the van and transporting him to the bank, the kidnappers again warned him they would frame him for robbery and harm his mother if he "ma[d]e a wrong move" in the scheme. Zavala instructed him that if he could not withdraw the entire $44,000 in cash, he should obtain a cashier's check in the name of "John Smith" for the balance. Atef entered the bank. Without success, he attempted to gain the attention of security personnel by displaying his torn clothing to the bank's security cameras. Informed by the teller he could only withdraw $10,000 in cash, he obtained a cashier's check made out to "John Smith" for the rest. Attempting to arouse suspicion, he wrote "Anthony Tamraz Newport Travelodge" at the top of the cash receipt, and told the teller to provide the ticket "if anyone asks questions."

Atef left the bank and spotted a police car in the parking lot, but the officer departed. Atef did not see the kidnappers' white van. Meanwhile, the teller telephoned the police after noticing Atef remained in the parking lot for 15 or 20 minutes. The officer returned and, at first, fearing for his safety, Atef said nothing, but then disclosed the ordeal he had undergone. He was later reassured no harm had come to his family.

Investigators discovered Reyes had used an expired driver's license to rent the Travelodge room around 8:30 p.m. on the night of the kidnapping, about a half-hour before Atef was abducted. The address on the driver's license led police to a postal box at a Newport Beach company named Commercial Mail Receiving Agency. In speaking with an employee there, the officers learned Reyes might have cell phone records with AT&T Wireless, and determined his current residence. The officers obtained a warrant for Reyes's AT&T cell phone records, which revealed more than 50 calls between Reyes's phone and Zavala's phone during the kidnapping. Cell tower records placed Reyes along the route Atef traveled on the day of the kidnapping, at or near the Travelodge when the room was rented, and when Atef was taken to the bank the next day. Zavala's phone records showed he called both Atef's business and bank during the kidnapping. Reyes cancelled his cell phone account a few days before police arrested him in December 2001.

The police apprehended Reyes and Derek Howard at Reyes's home. Howard's cell phone records and calls to and from Reyes placed him near the scene of the kidnapping and along the route Atef traveled earlier in the day. Searching a cabinet in Reyes's kitchen, the police found a photographic proof sheet and 35-millimeter negatives that included scenes of Reyes in leisure activities, but also photos of Atef and his residence and business. The police found a 35-millimeter camera and lens in Reyes's closet. They also found a lock pick set in the kitchen and photographs of Zavala in a kitchen mail slot. Elsewhere in the apartment, they discovered a black bag containing two hand-held radios and the paperwork to a police scanner. They also found a portable parabolic microphone and headset listening device, an item de-scribed as a "scope," and a business card for "Fox's Spy Outlet" advertising a specialization in stun guns, protective sprays, and surveillance equipment. Police officers found Reyes's expired driver's license and a Disneyland identification card tucked in a day planner located in the bedroom.[2] A backpack in the dining room contained Reyes's cell phone, pager, and his current driver's license. The police also found Howard's driver's license on the living room couch and his cell phone on the coffee table.

---

[2] The clerk at the Travelodge motel had noted on Reyes's room registration card that he worked at Disneyland.

The police arrested Zavala at gunpoint at his apartment after he tried to escape when they announced they had a warrant for his arrest. Atef identified Zavala in a pretrial photo lineup as the kidnapper who punched him several times in the motel room and took charge of obtaining his financial information and funds from his bank. Atef also identified a man named David Vargas as one of the two men who first approached him from the white van and tried to abduct him. He identified Robert Cadavas as one of the men guarding him in the motel room. DNA evidence recovered from the motel room matched Vargas and Cadavas. Vargas and Cadavas pleaded guilty to simple kidnapping (§ 207) before trial, in exchange for eight-year prison terms. Howard also pleaded guilty to that charge and received a one-year jail term.

At trial, Reyes's sisters testified Howard was often at Reyes's home, even when Reyes was absent, and that Howard treated Reyes's property as his own. Reyes's defense was that Howard had set him up by using his cell phone and the other items recovered at Reyes's apartment to perpetrate the kidnapping, including falsely registering the motel room in Reyes's name. Reyes's handwriting expert testified the signature on the Travelodge registration form was "most likely" someone else's, though the expert acknowledged it was "possible" Reyes had signed the form. Zavala presented no evidence.

II

DISCUSSION

A.  *Suppression Motion*

Defendant Reyes contends the trial court erred in denying his motion to suppress his cell phone records as the product of an illegal search. (U.S. Const., 4th Amend.) He argues investigating officers violated his expectation of privacy in the contents of the postal box he rented from Commercial Mail Receiving Agency, a private mail receiving company. Specifically, two officers asked an employee there if defendant had a postal box at the facility. The clerk answered affirmatively and produced Reyes's paperwork for renting the box. When the officers inquired whether defendant had mail in his box, the clerk responded by physically checking the box, which was located a few feet away, and returning with three pieces of mail, which she held in her hand to display—without opening them—to the officers. The outside of the envelope of one of the items addressed to defendant indicated it was a bill from AT&T. Based on this allegedly illegal search, defendant complains the officers knew to direct a warrant for his cell phone records to AT&T instead of some other carrier, and subsequently obtained records showing calls to and from his mobile phone around the time of the kidnapping.

■ Defendant's claim of error is without merit because he did not hold a reasonable expectation of privacy in the outside of envelopes addressed to him when the employee removed them from his postal box. The Fourth Amendment does not protect every subjective expectation of privacy, but rather only objectively reasonable expectations that society is prepared to accept as legitimate. (*Rakas v. Illinois* (1978) 439 U.S. 128, 141 [58 L.Ed.2d 387, 99 S.Ct. 421].)

We defer to the trial court's express or implied factual findings if supported by substantial evidence, but independently apply constitutional principles to the trial court's factual findings in determining the legality of the search under the Fourth Amendment. (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729] (*Glaser*).) Defendant complains the police orchestrated a search of his private postal box, but the record supports the trial court's implicit finding rejecting this claim. The officers did not search defendant's postal box or direct the clerk to reveal its contents. The lead officer testified at the suppression hearing that he did not ask the clerk "to open the mailbox and get the mail out . . . ." Rather, the clerk spontaneously displayed defendant's envelopes to the officers. Accordingly, the record supports the conclusion there was no governmental intrusion into defendant's postal box.

■ The Fifth Circuit Court of Appeals explained in *U.S. v. Osunegbu* (5th Cir. 1987) 822 F.2d 472 (*Osunegbu*) why defendant's Fourth Amendment claim fails. First, because the information is foreseeably visible to countless people in the course of a letter reaching its destination, "an addressee or addressor generally has no expectation of privacy as to the outside of mail." (*Id.* at p. 480, fn. 3; accord, *U.S. v. Choate* (9th Cir. 1978) 576 F.2d 165, 175–177 (*Choate*); see also *U.S. v. Hinton* (9th Cir. 2000) 222 F.3d 664, 675 ["There is no expectation of privacy in the addresses on a package, regardless of its class."]; see generally 1 LaFave, Search and Seizure (4th ed. 2004) § 2.7(a), pp. 731–732.)

■ Second, *Osunegbu* explained the Fourth Amendment does not apply to an employee's removal of mail from a postal box at a private mail facility because there, as here, "[t]he back of the box was open and the manager had complete and unfettered access to its contents. Although Mrs. Osunegbu argues that the manager had no authority to remove items from the box, she has pointed to no authority—either in the specific rental contract or otherwise—that supports this position. Given that the box is used solely by the renter to collect mail that the manager has already seen and handled, no legitimate purpose would be served by such a limitation on the authority of the manager." (*Osunegbu, supra*, 822 F.2d at p. 479.)

The *Osunegbu* court concluded these circumstances prevented a reasonable expectation of privacy that an employee would not retrieve mail placed in a postal box, noting "the manner in which private postal facilities are run virtually necessitates that the manager be allowed to reenter a box and remove the contents. If the manager originally placed a small package in the box and later received more mail that would not fit into the box because of the package, she would then have to reenter the box and remove the package, because a package would be easier to keep track of in the office area than loose mail. More fundamentally, and as illustrated by this case, the manager needs to be able to reenter a box, remove the contents, and then examine them if she has reason to believe that she has mistakenly placed into a box mail addressed to someone other than the renter of that box. . . . It is in the interests of both the Postal Service and private postal facilities that the facilities maintain the right to reenter the rented boxes to check for such mail, and [the] Osunegbus did not even attempt, either contractually or otherwise, to prevent the manager from reentering the box for this purpose." (*Osunegbu, supra*, 822 F.2d at pp. 479–480.)

■ We find *Osunegbu* persuasive and perceive no basis on which to distinguish it. There, as here, "the decisions as to when, and indeed whether, to put items into the box were left solely to the manager without any instructions . . . ." (*Osunegbu, supra*, 822 F.2d at p. 479, fn. omitted.) It followed that the manager "could have allowed anyone to watch her sort the mail, or to examine thoroughly the mail while it was in the office area." (*Ibid.*; see *Choate, supra*, 576 F.2d at p. 175 ["the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to government authorities"]; see also *Gabriel v. State* (Tex.Ct.App. 2009) 290 S.W.3d 426, 434 [store manager had authority to consent, as customer's agent, to search of postal box].) As in *Osunegbu*, nothing prevented personnel in defendant's mail facility from retrieving mail in his box and re-sorting it at the counter in public view, or providing access to anyone to areas where mail was sorted, stored for sorting, or held for a customer. As the *Osunegbu* court aptly observed, "a party has no reasonable expectation of privacy as to the outsides of items stored in a common area . . . ; such items are exposed both to those who have access to that area and to those, including law enforcement officers, who may be given permission to enter that area." (*Osunegbu, supra*, 822 F.2d at p. 479.) Similarly, there can be no reasonable expectation of privacy in the outside surface of items that may be held or handled in a common area.

True, the owner of the mail facility testified he considered mail to be delivered to the customer when placed in the customer's box and that "[n]*ormally* we don't, you know, show any mail to anybody unless we have a search warrant or some court papers, you know, that tells us to show it." (Italics added.) But the trial court, as the trier of fact at the suppression

hearing, could reasonably interpret the owner's ambiguous use of the word "normally" as a less-than-categorical statement that left open the possibility mail might be shown to others at an employee's discretion, or otherwise exposed to public view. (See *Glaser, supra,* 11 Cal.4th at p. 362 [reviewing court defers to trial court's implied factual findings if supported by substantial evidence]; *People v. Davis* (2005) 36 Cal.4th 510, 528 [31 Cal.Rptr.3d 96, 115 P.3d 417] [appellate court must view record in denial of suppression motion " 'in the light most favorable to the trial court's ruling' "].)

In any event, no evidence showed the mail facility promised or communicated to defendant that an employee would never retrieve mail once delivered to his box. As in *Osunegbu,* no evidence showed defendant's contract with the mail facility included such a policy or that defendant instructed the mail facility to handle his mail a particular way or attempted to restrict employees from removing mail already placed in his box, which *Osunegbu* observed would be contrary to expected practice. Here, defendant nowhere negated the reality that mail facility operations routinely entail employees having continuous access to postal boxes.

▬ Defendant asserts, as he testified below, that "[h]e did not have any belief that the employees of the business would ever remove mail from the boxes or that law enforcement or anyone else could simply look at the mail in his box on request." He also testified he believed only he, or whomever he provided his key to, could retrieve mail from his box, exclusive of any employees. But as *Osunegbu* explained, such a subjective belief is unreasonable, and therefore outside the Fourth Amendment's protection, given the manner in which mail facilities operate. In particular, those operations include ready employee access, at the employee's discretion, to the open side of the box to retrieve mail, during which time the employee may, whether purposefully or inadvertently, expose the outside of the mail to any number of persons. These circumstances preclude any reasonable expectation of privacy in any markings displayed on the outside of the envelope, such as those identifying AT&T Wireless as the addressor here. Consequently, the trial court did not err in denying defendant's suppression motion.

B.–D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1183.

## III

## DISPOSITION

The judgment is affirmed.

O'Leary, Acting P. J., and Ikola, J., concurred.

A petition for a rehearing was denied November 30, 2009, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied February 10, 2010, S178571.