[CB1] 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                       NO.
 2-08-143-CR

 

 

RHONDA ORR                                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 362ND DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.      Introduction








A jury
found Appellant Rhonda Orr guilty of first-degree arson resulting in the death
of her husband, James Orr,[1]
and assessed her punishment at eighty-eight years=
imprisonment.  In seven points, Rhonda
challenges the legal and factual sufficiency of the evidence to support the
arson verdict, the legality of the search of her home on October 16, 2003, the
admissibility of testimony by the State=s expert
witness, the admissibility of autopsy photographs, the trial court=s ruling
on the State=s closing argument, the trial
court=s denial
of her motion for mistrial, and the trial court=s
definition of Areasonable doubt@ in its
jury charge.  We affirm.

II.     Procedural Background

A grand
jury indicted Rhonda in February 2004. 
The indictment alleged that Rhonda started the fire by igniting a
combustible substance knowing that the house was within the limits of an
incorporated city or town with intent to damage or destroy the house and that
James Orr died as a result of the fire. Rhonda pleaded not guilty.  Her case was tried in March 2008, at the
conclusion of which the jury returned a verdict of guilty and assessed
punishment at eighty-eight years=
confinement.  

III.     Factual Background








Rhonda
and James Orr married in 1999.  James,
who was disabled from a childhood injury and confined to a wheelchair, died in
a house fire in the early morning hours of May 14, 2003.  The State=s theory
at trial was that Rhonda, motivated by insurance money, intentionally started
the fire that killed James. Rhonda contended that she and James, although in
the process of a divorce, did not have a contentious relationship and that the
cause of the fire could not be determined. 

Former
Little Elm Police Officer William Miller[2]
received a 9-1-1 dispatch around 3:45 a.m. that the fire department was en
route to a house fire with a person still inside the house.  He arrived Areally
quickly,@ noticed
smoke coming out of the house, and saw Rhonda, her daughter, and neighbors
standing outside.  Rhonda rushed up to
him, pointed him to her house, and said her husband was still in the back
bedroom.  Rhonda told Officer Miller she
had tried to get her husband out of the house but he had kicked her away and
shut and locked the door.  








Officer
Miller said Rhonda went with him to the front door area of the house where she
pointed him toward the master bedroom door. 
He then went into the house alone and found the door to the master
bedroom locked.  He called out for James
but heard nothing.  Officer Miller kicked
in the door, and chest-high smoke billowed out of the room.  Officer Miller entered the room and found the
wheelchair but did not find James.[3]  He retreated toward the driveway, taking
Rhonda with him from the front-door area. 
Rhonda insisted James was in the bedroom, so Officer Miller made two
more unsuccessful trips into the master bedroom to find James.  The fire and increasing smoke caused Officer
Miller to lose his breath and start choking, and parts of the ceiling fell on
him as he searched the master bedroom. 
Concerned for his own safety, Officer Miller felt he had to leave the
house.  Officer Robert Walton arrived
near this time, and, trying to find a way into the house, he and Officer Miller
went to the back of the house.  Officer
Miller kicked out the back window to the master bedroom with his foot, getting
his boot caught in the window in the process, and causing air to rush in and
the flames then to rush out.  

When the
fire department arrived, Officer Miller returned to the front of the house and
apologized to Rhonda for not finding James. 
He was then care-flighted to Parkland Hospital for treatment.  Officer Miller later learned James was found
in the bathroom near the toilet; he testified he might have found James had he
been told there was a restroom in the bedroom. 
Officer Miller said Rhonda seemed upset at the scene of the fire.  In addition, he said that although she had
not previously done so, Rhonda insisted on going back inside the house once the
fire department arrived. 








Bart
Vest, a firefighter-paramedic with the Frisco Fire Department, said he arrived
at the scene of the fire to assist in treating any victims, and said he
understood two police officers and a pregnant female (Rhonda) had smoke
inhalation.  Vest testified Rhonda did
not want any treatment and insisted that someone get her husband out of the
house.  Vest said Rhonda appeared upset
and wanted the efforts directed to her husband, who was in a wheelchair and
could not get out of the house on his own. 

Robert
Wren O=Neal and
his wife, Lindsey O=Neal, lived next door to Rhonda
and James.  O=Neal
testified that he and his wife had been awakened around 3:30 or 3:45 a.m. on
May 14, 2003, by Rhonda=s Afrantic
knocks@ at
their front door.  Rhonda, who stood at
the door with her daughter Amanda,[4]
said that her house was on fire and that James was still inside.  Lindsey O=Neal
called 9-1-1 because Rhonda said she had not done so.  








O=Neal
testified that Amanda stayed with his wife and that he went next door with
Rhonda.  He could hear the smoke
detectors going off and saw the entryway full of smoke.  He recalled that Rhonda frantically screamed
that James was locked in the master bedroom. 
O=Neal
went down the hallway with Rhonda to the door of the master bedroom, but the
door was locked.  The doorknob was hot,
and black smoke billowed out from the top, bottom, and sides of the door.  O=Neal and
Rhonda yelled James=s name and could hear James
moaning or grunting; O=Neal said James sounded like he
was in severe pain.  Because O=Neal did
not feel safe in the house, he and Rhonda then went outside the house to the
driveway, although O=Neal acknowledged Rhonda was
hesitant to leave.  O=Neal
said no one else was around until Officer Miller arrived in a Acouple
[of] minutes or so.@ 
O=Neal
testified that Rhonda was in his presence from the time she knocked on his door
until Officer Miller arrived, that Rhonda did not go into the house with
Officer Miller, and that Rhonda could not have gone into the house without his
knowledge. 

O=Neal
said it seemed unusual that Rhonda parked her car across the street in front of
a neighbor=s house the night of the fire
because she typically parked her car in the driveway or in the garage; he had
not previously seen it parked across the street.  O=Neal
also said James usually parked in the driveway or on the street in front of the
Orrs= house,
but his car was parked on the street between the Orrs= house
and the O=Neals= house
on the night of the fire. 








Lindsey
O=Neal
testified Rhonda did not have time to go into the house by herself because her
husband left with Rhonda immediately after Rhonda told them that there was a
fire and that James was in the bedroom. 
She also testified that, after the fire, Rhonda asked her to lie and say
that she was the pregnant woman at the scene, not Rhonda, because no one knew
that Rhonda was pregnant and that James was not the father.  Lindsey O=Neal
also said she believed Rhonda was Afake
crying@ when
the rescue workers removed James=s body
from the house. 

Captain
Shawn Russell of the Little Elm Fire Department testified that he received a
call about a house fire with a handicapped person trapped inside.  He testified that there were heavy fire
conditions when he entered the house to find the master bedroom.  He could not see his hand in front of his
face and he was Apretty much on [his] belly
crawling around.@ 
Captain Russell found James in the back of the bathroom, sitting
Indian-style, and slumped over with his hands between his legs.  James had no pulse, appeared burned, had a
lot of black around his mouth and chin, and was lifeless.  About that time, the Frisco Fire Department
arrived and helped get James out of the house. 
The Frisco paramedics then took over and tried unsuccessfully to
resuscitate James.  Dr. Gary Sisler, a
deputy medical examiner for Tarrant, Parker, and Denton counties, testified
that James died from smoke inhalation and thermal burns covering eighty percent
of his body.  








Donald
Diviney is a former sergeant in the Criminal Investigation Division of the
Little Elm Fire Department.  He responded
to the fire and, upon arriving, spoke with Officer Miller, Wren O=Neal,
and fire department personnel.  He also
spoke briefly with Rhonda about Officer Miller=s
attempts to rescue James. 

Diviney
said he further interviewed Rhonda around 9:30 a.m. that morning after she
returned from the hospital.  Rhonda told
him James had wheeled through the living room the night before while she and
Amanda watched television and Awas
bragging@ about
being Atoasted.@  She also told Diviney that James was taking
Flexeril. 

According
to Diviney, Rhonda told him there had been a fire in the house earlier in the
evening that they had extinguished. 
Diviney said Rhonda told him she saw a bottle of alcohol that had tipped
over, a clock radio hanging by its cord, and a tipped-over candle on the night
stand closest to the bedroom door. Diviney believed that Rhonda was implying
that the earlier fire started because James was intoxicated from alcohol and
Flexiril and had knocked over the candle. 








Rhonda
told Diviney she was awakened later by the alarm from the new fire.  She said that when the second fire woke her
up, she first tried to get into the master bedroom but could not.  She told Diviney she then took Amanda to the
neighbors= (the O=Neals=)
house.  After returning from the
neighbors= house, and apparently finding
the bedroom door open, she went inside, found James on the floor, and tried to
get him out.  Rhonda told Diviney that
there were a lot of flames and smoke in the room and that the bed had already
burned to the point where the bedsprings were visible.  She also told Diviney that James struggled
with her between the bed and doorway, that James kicked her away, that the door
slammed shut, and that she could not get the door open.  Rhonda said she then went back to the
neighbors= house and returned with Mr. O=Neal.
However, Diviney testified that unless the O=Neals
were lying, there was no possibility that Rhonda went into the house and
struggled with James as she claimed to have done because Mr. O=Neal was
Avery
clear@ that he
was with Rhonda until emergency personnel arrived.  

Diviney
further testified that he and Dave Wallace accompanied Rhonda into the house
later on the morning of May 14, 2003, so that she could retrieve toiletries and
other personal items.  They were in the
house less than five minutes, and Diviney stayed with Rhonda the entire
time.  Diviney said Rhonda did not take
any folders containing insurance policies out of the house with her. 








Thomas
Stocks was Rhonda=s and James=s Farmer=s
Insurance agent. Stocks testified that James and Rhonda had a Farmer=s
homeowner=s policy with $176,000 on the
dwelling and $108,000 for personal effects. 
James also had a $250,000 twenty-year term life insurance policy naming
Rhonda as the beneficiary.  Stocks said
Rhonda called him at about 2:20 p.m. on the date of the fire and advised him
that A[w]e had
a loss, a fire,@ and they discussed the
damage.  Stocks said that they talked for
more than twenty minutes about the logistics of making a claim and getting
repairs done.  Stocks said that he had no
idea that something worse had occurred, but that at the end of the
conversation, Rhonda said, AOh, we
lost Jimmy today.@ 
Stocks said that Rhonda had no inflection or feeling in her voice and
that her tone was A[j]ust like you and I would talk
about mowing the grass.@ 


Stocks
further testified that, on the application for the Farmer=s life
insurance policy, the question as to whether there was any other life insurance
in force or pending at the time of the application was answered Ano.@  Stocks stated he did not know that there were
other life insurance policies on James=s life
at the time of his death.  

Ron
Keaton, an investigator for the Denton County district attorney=s
office, discovered that Rhonda and James had over $1 million in applicable
insurance.  In addition to the Farmer=s
homeowner=s and term-life policies, Keaton
identified two Cigna life insurance policies totaling $150,000, a Monumental
Insurance Company life insurance policy with a $225,000 rider, a CUNA $100,000
accidental death policy, and a $200,000 policy with Fidelity and Guaranty Life
Insurance Company.  Rhonda was a
beneficiary under each policy. 








Keaton
testified that the insurance records showed Rhonda took out the Monumental
policy on February 15, 2003, three months before James=s death,
and that Rhonda called Monumental at 2:01 p.m. on May 14, 2003.  Keaton also said Rhonda contacted Farmer=s at
12:25 p.m. on May 14, 2003, less than eight hours after James=s death,
and that she called CUNA at 2:57 p.m. the same day.  Rhonda also contacted Cigna within eight
hours of James=s death. Keaton did not know
exactly when Rhonda contacted Fidelity and Guaranty Life Insurance Company, but
he said the company had already sent Rhonda a written response by May 20,
2003.  

Texas
Ranger Tracy Murphree interviewed Rhonda on June 19, 2003. Ranger Murphree
videotaped the interview, and the State published the video to the jury.  During the video, Ranger Murphree asked
Rhonda about the differences between her version of events and those of her
daughter and the O=Neals.  Rhonda told Ranger Murphree that James said
he was toasted, that there was an earlier, smaller fire that James put out,
that she struggled with James while trying to rescue him from the second fire,
and that he had kicked her out of the room and locked the door.  Rhonda denied culpability and was released
after the interview. 








Ranger
Murphree testified that, contrary to Rhonda=s
version of the events, neither alcohol nor Flexeril was found in James=s
system.  Ranger Murphree said he never
had any reason to doubt either of the O=Neals=
veracity and that he could not reconcile Rhonda=s
version of events, including her alleged struggle with James while trying to
rescue him, with the O=Neals=
statements that Rhonda could not have gone inside to struggle with James as she
described.  On cross-examination, Ranger
Murphree agreed that Rhonda=s
daughter said Rhonda went into the house for about twenty seconds before taking
her to the O=Neals= house.  However, Ranger Murphree said Rhonda did not
have soot in her nose or in her mouth, even though Rhonda claimed the fire was
rather large at the time of the struggle. 
Ranger Murphree also pointed out that, in June, Rhonda had denied
knowing about the existence of the multiple insurance policies, but she had
contacted all of the insurance companies on the day of the fire in May.[5]









Jeffrey
Bowery was a deputy fire marshal for Denton County in May 2003 and went to the
scene early on the morning of the fire to take photographs.  Bowery said he initially believed the fire
started between the foot of the bed, the dresser, and the bedroom entrance, but
said he later concluded there was a second point of origin between the bed and
the bay window toward the back of the house. 
Although he agreed a fire is fueled by oxygen and would burn toward an
open window, Bowery did not believe the broken window caused deeper charring
near the window.  Bowery also testified
he did not believe there was a point of origin where Rhonda said the candle
fell over because there was far less charring in that area. 

Raiford
(ARay@) Powell
testified as an expert witness for the State. 
He started fire investigation in 1971, authored a book on fire pattern
recognition in 1999, and is an instructor teaching fire origin and cause and
fire pattern analysis for police and fire departments across the United States
and in several other countries.  Powell
has performed private investigations since 1992 and believes he has
investigated more than 2,500 fires. 

Powell=s
opinion was that someone intentionally set the fires because there was more
than one point of origin.  He explained
his opinion by discussing the charring and the burn patterns on several items
within the room.  Powell said a char
analysis looks at the depth of the burn into wood and explained that fire
plumes create patterns as they burn. 








Powell
asserted that one point of origin was near the window and that it was caused by
a combustible substance.  He maintained
that the charring on the bed posts and night stands suggested the fire burned
longer on the window-side of the room. 
The burn patterns on the night stand on that side of the room and the
headboard also showed that more fire burned on the window-side of the room and
that the fire moved toward the bathroom. 
A candle on the other night stand away from the window did not meltCthe
candle was still wrapped in paper, which would have been burned off, and the
candle would have melted if it had started the fireCand the
night stand itself was hardly charred. 
The bed springs collapsed on the side of the bed near the window but not
on the other side, and there was still mattress fabric and foam rubber
remaining on the side of the bed away from the window. 

Powell
believed the fire near the window was caused by a combustible substance,
possibly Wild Turkey liquor.[6]  He said something Abrought
the fire all the way down onto the floor,@ so much
so that the carpet-tack strip under the window was charred and burned.  Powell explained that fire usually burns
upward, so an ignitable, combustible substance must have been used to cause the
fire to burn the carpet-tack strip. 








Powell
testified he believed the second point of origin was in the area of the room
toward the room entrance.  The chest of
drawers had heavier charring on the side toward the room entrance and the other
side did not burn, which was also a strong indicator to him that the fire by
the window did not spread to the other side of the room.  Powell also said the closet door in that area
was almost completely consumed by fire. 
Powell stated his opinion was consistent with Officer Miller=s
recollection of seeing two separate fires in the room before he later broke out
the window. 








Powell
also discussed the carpet-tack strip and baseboard between the entrance door
and the chest.  He said the exposed
carpet-tack strip was burned, meaning the hottest part of the fire was on the
floor Awhere
there=s
something liquid most probably burning.@  Powell said the fire was quickly extinguished
and did not burn long enough for it to burn Adown@ and
smolder on the floor in a way that would cause that much damage, but had to
have been a fire that burned Aup.@  Thus, Powell believed the burn patterns and
fire patterns showing that the fire was at floor level indicated a definite and
distinct second point of origin, also caused by a combustible substance like
gasoline, kerosene, or alcohol.[7]  An investigative dog that was brought in
during the investigation was not trained to identify alcohol, so Powell said it
would not have picked up the odor of alcohol. 

Powell
stated that the two insurance investigators each found one of the two separate
points of origin he found in the bedroom. 
One identified a point of origin near the window, and the other found an
area of origin closer to the room entrance. 
Explaining his ultimate conclusion that the fires were intentionally
set, Powell testified that A[t]he
fires had to be set if they=re not
connected together . . . [b]ecause there=s no way
they communicated one to the other.@   

On
cross-examination, Powell agreed that the rate of fire growth as recorded by
witnesses is not always reliable evidence of an incendiary fire. Powell also
acknowledged that there would have been some ventilation from the door to the
window when the officer kicked out the window and that inflow of oxygen to a fire
can cause mistaken burn patterns.  But he
explained that mistaken patterns take time to occur whereas the main part of
the fire was of short duration.  Powell
also maintained that the broken window did not cause additional charring
because the side closest to the oxygen source (the window) would have charred
less.  Because more charring occurred on
the side of the room toward the window, he could not say the ventilation toward
the window caused the additional charring. 








Three of
James=s
friends testified at trial.  Brock
Fischer said he first learned that James and Rhonda had marital troubles when
he talked with james on May 1, 2003. 
Fischer was going to help James move to an apartment the following
Saturday after the fire.  He said James
seemed depressed or concerned but not suicidal. 
James worked with Christopher Tunks, and Tunks knew James and Rhonda
were separating.  Tunks testified he was
scheduled to help James move into the apartment three days after the fire, had
James not died.  Tunks testified that he
believed James was excited and looking forward to starting a new chapter in his
life, that James was not depressed that Rhonda had a new boyfriend and was
pregnant, and that he had no indication James would consider suicide.  Tunks remembered seeing Rhonda at James= funeral
joking and being very affectionate with her boyfriend. 

Loretta
Caretti said she believed James was Aa
wonderful, very wonderful person.@  Caretti also said Rhonda was giggling and
laughing with her boyfriend during the entire memorial video shown at the
funeral.  When asked if Rhonda cried at
the funeral, Caretti stated: AShe was
not crying.  She was laughing.@ Caretti
also said Rhonda sat in her male companion=s lap
during the wake at a relative=s house
just hours after James was buried. 








Four of
Rhonda=s
friends testified on her behalf.  Carol
Jones said that she had known Rhonda since 1999 and that Rhonda was a Avery
caring, doting wife.@ 
Tamra Holden said Rhonda is a Avery
tender-hearted, sweet mother and tender person, compassionate, always kind of a
nurturer.@ 
Jill Hanrahan testified she believed Rhonda to be non-violent and
truthful.  

Angela
Short is Rhonda=s best friend and has known
Rhonda for twenty years.  Short said she
had seen Rhonda and James together for several hours the Sunday before the
fire; they were laughing and Agetting
along great.@ 
Short said she knew Rhonda and James previously agreed to separate and
were living in separate bedrooms for about five months.  However, she said their interaction the
Sunday before the fire was typical of their interaction the previous five
months.  Short also said Rhonda was in a
daze for several weeks after the fire and Acould
not believe that [James] was gone.@  

Short
said Rhonda did not have a lot of money and did not own any property.  She testified that James=s
parents employed Rhonda, paid Rhonda and James=s rent,
paid Rhonda=s tuition, and did not know
Rhonda was pregnant with another man=s
child.  Short said she attended the
funeral and wake; she specifically denied that Rhonda sat in her boyfriend=s lap
during the wake and said Rhonda did not even sit with her boyfriend during the
funeral. 








Jennie
Mannie is a real estate agent who consulted with Rhonda and James about selling
their house.  She visited their home in
May 2003 and said four people were there at the time: James, Rhonda, Rhonda=s
daughter, and Rhonda=s boyfriend.  She said that James agreed with the plan to
sell the house and that she understood Rhonda would receive all proceeds from
the sale. Mannie also testified, however, that Rhonda and James were keeping
their pending divorce and house sale from James=s
mother, so they did not want a sign in their yard and wanted the realtor=s
lockbox hidden from view. 

Dr. Gary
Wimbish, board certified in forensic toxicology, testified for the defense that
he reviewed James=s autopsy report and that James
had Benadryl in his system in a much greater dosage than he would expect for
therapeutic use or controlling allergies. 
Dr. Wimbish explained that the likely symptoms of that dosage would be
sleepiness, drowsiness, agitation, and confusion.  The concentration of the medicine would
eventually cause a person to go to sleep. He said if the timing of the Benadryl
dosage and the fire were close together, it is possible the carbon monoxide
from the fire would add to the confusion. 
Dr. Wimbish was of the opinion that a person with this amount of
Benadryl in his system, if awoken by a person or smoke alarm, would likely be
disoriented and confused. 








Dr.
Wimbish further testified that Benadryl and alcohol work together to increase
symptoms of confusion and lethargy.  He
said that a person of James=s size
could have four to five drinks and not have alcohol in his system several hours
later.  However, Dr. Wimbish acknowledged
that he had no information as to when James drank alcohol, that he assumed
James stopped drinking by 9:30 p.m. the night before, and that he did not know
how much James had to drink.  Dr. Wimbish
also said Flexeril has a half-life of six hours, but acknowledged there was no
Flexeril found in James=s system. 

Michael
Keller also testified as an expert witness for Rhonda.  Keller started working as a firefighter with
the City of Richardson in 1973 and later served in various police departments
before moving into fire and arson investigation units.  Keller has been in private business doing
insurance investigations for the last fifteen years and has taught courses at
various seminars in the metroplex area and a fire and arson investigation
course at a police academy.  He testified
that he first investigated the scene of the fire at the request of a Farmer=s
insurance adjuster on May 16, 2003, and that he found insufficient evidence to
prove the origin or cause of the fire. 








Keller
was of the opinion that there was not an area of origin near the window.  He reached this conclusion because the
ventilation from the broken window distorted the burn pattern; there was still
sheetrock and a large part of the window frame remaining; there was no deep
charring of the ceiling joists in the area, indicating the ceiling remained
intact through most of the fire; the heavy sooting near the window actually
indicated that it was hotter on the other side of the room (because sooting
otherwise burns off); and all his findings near the window were consistent with
ventilation as opposed to a separate point of origin.  He also testified that the carpet-tack strip
could have been burned by ventilation or something else burning on the floor
and that there was not enough damage to the night stand on the window-side of
the bed to indicate there was a second point of origin near the window. 

Keller
saw Aheavy
damage@ near
the foot of the bed and toward the entry door of the master bedroom.  In Keller=s opinion,  the fire spread from there toward the window
and ventilation from the window caused the heavy damage near the window. 








Keller
testified he did not find an ignition point or a clear-cut point of
origin.  He also said that he did not
think an accelerant was used and that he would usually find evidence of an
accelerant when an amateur started the fire. Keller placed no significance on
the collapsed bed springs because he said the prior use of the bed affects how
the bedsprings collapse and said the bed springs could collapse at temperatures
as low as 400 degrees.  He said he did
not do any char analysis and did not spend much time analyzing the bedposts
because he knew there was a large fire in the room and because ventilation
distorts the burn pattern.[8]  Keller also testified a responsible
investigator could not say the charring near the bathtub definitively occurred
on May 14, 2003. 

Keller
testified that without evidence to prove the cause and origin of a fire, the
cause of a fire must remain Aundetermined.@  Because he could not rule out possible accidental
causes, Keller testified he could not say the fire was intentionally set and
concluded the cause of the fire was Aundetermined.@ 








On
cross-examination, Keller admitted that he incorrectly identified the night
stands and the sides of the burned footboard in his report, meaning his report
incorrectly set forth which night stand and portion of the footboard was more
severely burned.  He also agreed the
burned carpet-tack strip was consistent with low burning or a point of origin
in the area.  Keller acknowledged that a
third investigator placed the area of origin near the window and that the State=s
expert, Powell, identified both of the areas of origin found by Keller and the
other expert.  Keller also agreed that
Farmer=s, the
company for which he investigated the fire, ultimately disagreed with him and
concluded the Aloss was not accidental but was
instead due to an incendiary fire that was caused by [Rhonda].@  Finally, Keller acknowledged that multiple
sources of unexplained fires are consistent with an intentional fire and that
the occurrence of two totally unconnected fires is probably arson.  

IV.    Sufficiency of the Evidence

In her
seventh point, Rhonda challenges the legal and factual sufficiency of the
evidence supporting her conviction.  

A.     Standard of Review

In
reviewing the legal sufficiency of the evidence to support a conviction, we
view all of the evidence in the light most favorable to the prosecution in
order to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007).








When
reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party.  Neal v. State, 256 S.W.3d 264, 275
(Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 1037 (2009); Watson
v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
factfinder=s determination is clearly wrong
and manifestly unjust or whether conflicting evidence so greatly outweighs the
evidence supporting the conviction that the factfinder=s
determination is manifestly unjust.  Lancon
v. State, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson, 204
S.W.3d at 414B15, 417.         

B.     Applicable Law

A person
commits the offense of arson if she starts a fire with intent to destroy or
damage a building or habitation within the limits of an incorporated city or
town.  Tex. Penal Code Ann. '
28.02(a)(2)(A).  The offense is a
first-degree felony if a person suffers bodily injury or death Aby
reason of the commission of the offense.@  Id. '
28.02(d)(1).  








ATo
establish the corpus delicti in arson cases it is necessary to show that a fire
occurred and that the fire was designedly set by someone.@  Mosher v. State, 901
S.W.2d 547, 549 (Tex. App.CEl Paso
1995, no pet.); see also Troncosa v. State, 670 S.W.2d 671, 680 (Tex.
App.CSan
Antonio 1984, no pet.).  A jury may infer
intent from any facts that tend to prove its existence, such as acts, words,
and conduct of the defendant.  See
Christensen v. State, 240 S.W.3d 25, 32 (Tex. App.CHouston
[1st Dist.] 2007, pet. ref=d).  ACircumstantial
evidence is as probative as direct evidence in establishing the guilt of an
actor, and circumstantial evidence alone can be sufficient to establish guilt.@  Hooper v. State, 214 S.W.3d 9, 13
(Tex. Crim. App. 2007).  AAttempts
to conceal incriminating evidence, inconsistent statements, and implausible
explanations to the police are probative of wrongful conduct and are also
circumstances of guilt.@ 
Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).  Each fact need not point directly and
independently to the guilt of the accused, so long as the logical force of the
probative evidence, when coupled with reasonable inferences to be drawn
therefrom, is sufficient to support the conviction.  See Evans v. State, 202 S.W.3d 158,
166 (Tex. Crim. App. 2006).  

C.     Legal Sufficiency








The
record contains legally sufficient evidence that Rhonda intentionally set the
fire, and it is undisputed that James died as a result of the fire.  The State=s expert
testified the fire was intentionally set because there were three points of
origin, the points of origin did not communicate to one another, and the points
of origin were caused by a combustible substance, possibly Wild Turkey
liquor.  The medical examiner testified
James died from smoke inhalation and thermal burns covering eighty percent of
his body.  Several witnesses testified
that Rhonda did not seem remorseful at the scene, at the funeral, at the wake,
or on the telephone with the insurance agent, and that Rhonda contacted at
least four insurance companies within hours of James=s
death.  See Ovalle v. State, No.
03-08-00334-CR, 2009 WL 1708826, at *9B11 (Tex.
App.CAustin
June 19, 2009, pet. ref=d) (mem. op., not designated for
publication) (finding legally and factually sufficient evidence of arson and
recognizing jury could infer intent from defendant=s
conduct before, during, and after the fire); Fitts v. State, 982 S.W.2d
175, 185B87 (Tex.
App.CHouston
[1st Dist.] 1998, pet. ref=d)
(holding there was legally and factually sufficient evidence of arson where,
among other things, defendant and State offered conflicting expert testimony of
an incendiary fire and defendant cried more intensely when firemen were close
to him, did not seem distraught at the scene, and gave inconsistent statements
to the authorities).  Rhonda gave
implausible explanations of the fire and her efforts to save James and denied
knowledge of the life insurance policies in June when she had already made
claims on all of the policies in May. See Guevara, 152 S.W.3d at 50
(recognizing inconsistent statements and implausible explanations are
circumstances of guilt); Fitts, 982 S.W.2d at 185B87. 








There
was evidence that Rhonda also had motive. 
James had decided to move out of the house and into an apartment the
following Saturday.  James=s
parents did not knowCand Rhonda did not want them to
knowCthat she
and James had recently decided to immediately separate and divorce, that they
had taken steps earlier the same month to sell the house, or that Rhonda was
pregnant with another man=s child.  See Guevara, 152 S.W.3d at 50 (AMotive
is a significant circumstance indicating guilt.@).  Rhonda was dependent upon James=s
parents for her income, and they were paying for the house and her tuition for
nursing school.  Rhonda was the beneficiary
on almost a million dollars of life insurance on James=s life
in addition to the insurance on the house. 
As argued by the State, Rhonda would need these funds if the truth came
out and James=s parents=
benevolence ended, and she made claims on each policy within hours of the fire
and James=s death.   

Viewing
the evidence in a light most favorable to the prosecution, a rational jury
could have determined beyond a reasonable doubt that Rhonda, with intent to
destroy or damage the habitation, ignited a combustible substance in her Little
Elm habitation, causing James=s
death.  See Jackson, 443 U.S. at
319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  We hold that the evidence was legally
sufficient to support the jury=s
verdict.  

D.     Factual Sufficiency

1.     Rhonda=s
Contentions








Rhonda
argues the evidence is insufficient to support her arson conviction because the
evidence showed she attempted to rescue James, James acted in a bizarre and
confused manner when she attempted to rescue him, and she had a caring
disposition.  Rhonda=s
friends testified Rhonda is non-violent, is truthful, and has a caring
disposition, the first responders and police witnesses testified she seemed
concerned and upset about James=s being
trapped in the fire, and expert testimony supported her theory that James was
confused and fought her efforts to save him by the combination of Benadryl and
alcohol in his system.  On the other
hand, the State offered evidence that Rhonda did not attempt to rescue James
from the burning bedroom as she claimed, that she was Afake
crying@ at the
scene, that she contacted numerous insurance companies within hours of James=s death,
that she was laughing at the funeral, and that she sat in her boyfriend=s lap at
the wake.  Further, even if Rhonda did
attempt to rescue James, her rescue attempts do not render the evidence
insufficient to establish arson because Athe
offense of arson is complete whenever the actor starts a fire with the
requisite culpable mental state, whether or not damage of any kind actually
occurs.@  Mosher, 901 S.W.2d at 549; see also
Wallace v. State, Nos. 04-08-00421-CR, 04-08-00422-CR, 2009 WL 2265023, at
*3 (Tex. App.CSan Antonio July 29, 2009, no
pet. h.) (mem. op., not designated for publication) (rejecting defendant=s
argument that he lacked requisite intent to damage or destroy building where
defendant put the fire out and little damage occurred).








Rhonda
also contends the evidence is insufficient because her expert witness Aopined
that he believed that the earlier fire had not been extinguished, was
smoldering and then later caught on fire again which led to the victim=s death@ and
because she offered a plausible explanation of how the fire started. However,
Rhonda=s expert
witness stated only that a smoldering fire could spread more quickly than a
fire otherwise would.  He did not say the
earlier fire smoldered, later caught fire, and led to James=s
death.  In fact, Rhonda=s expert
acknowledged on cross-examination that the Abig fire@ did not
start in the area where Rhonda said the smaller fire occurred earlier in the
evening.  Further, the candle on the
night stand where Rhonda claimed the earlier fire started did not melt during
the Abig
fire.@  If the fire started in that area, the candle
would have melted Ainto a puddle.@  Rhonda=s expert
also admitted the earlier, smaller fire did not cause the Abig
fire.@ 








Rhonda
next argues the evidence is insufficient because the State did not
scientifically test the carpet for an ignitable substance, because ventilation
through the window made any char analysis and inspection inconclusive, and
because her expert witness testified the point of origin could not be determined.
We disagree.  The State offered evidence
that the carpet-tack strip would not have burned like it did without the
presence of an ignitable substance and that any ventilation through the window
did not affect the char analysis.  The
State also offered expert testimony that there were at least two, possibly
three, separate points of origin caused by a combustible substance, likely
alcohol, and that the fires were intentionally set.  And no evidence suggested that anyone caused
the fires but Rhonda.  Rhonda=s
complaints relate to conflicts between the testimony of the State=s
experts and Rhonda=s expert, a classic battle of
experts.  We must leave the resolution of
those conflicts to the jury.[9]  See Cain v. State, 958 S.W.2d 404, 408B09 (Tex.
Crim. App. 1997) (holding that the weight to be given to Acontradictory
testimonial evidence is within the sole province of the jury, because it turns
on an evaluation of credibility and demeanor.@).    

2.     The Evidence is Factually Sufficient








In
addition to the evidence discussed above, the record contains evidence that
Rhonda told investigators James was drinking, had claimed to be Atoasted,@ and was
taking Flexeril the evening before the fire, yet James had no alcohol or
Flexeril in his system.  Rhonda told
investigators she went into the house to rescue James after she took her
daughter to the neighbors= house and that the fire was
quite large at the time.  But Mr. O=Neal
testified he was with Rhonda the entire time and Ranger Murphree said Rhonda
did not have soot in her nose or mouth after the alleged rescue attempt.  See Guevara, 152 S.W.3d at 50; Fitts,
982 S.W.2d at 185B87.  Rhonda also parked her car across the street
from her house the night of the fire instead of in the driveway or garage and
asked Mrs. O=Neal to lie to the police.  Rhonda sought to prove an earlier fire (that
James presumably caused) smoldered and caused the second fire, but Rhonda=s expert
agreed the fire did not start near the alleged earlier fire, and one of James=s
friends testified that James was not suicidal. 
Rhonda denied knowing of various insurance policies in June when she had
already contacted those insurance companies in May within hours of James=s
death.  Finally, Officer Miller testified
he might have been able to save James had Rhonda told him there was a bathroom
connected to the master bedroom.  

Reviewing
all the evidence in a neutral light, we recall Rhonda=s
evidence that she made efforts to rescue James, that she seemed upset at the
scene,  and that she declined medical
treatment because she wanted rescue efforts directed toward James.  Rhonda=s
friends testified that she is an honest, caring person and that she was in a
daze after James died.  Her real estate
agent testified that she and James had agreed she would receive all proceeds
from the sale of the house.  Rhonda also
offered evidence that the Benadryl in James=s system
could have caused confusion when he was confronted by the fire.  Finally, Rhonda=s expert
witness testified the cause of the fire could not be determined, mostly because
of the ventilation from the window after it was broken by Officer Miller. 








Viewing
the evidence in a neutral light, we nevertheless conclude that a rational trier
of fact could have found beyond a reasonable doubt that Rhonda, with intent to
destroy or damage the habitation, ignited a combustible substance in her Little
Elm habitation, causing James=s
death.  See Ovalle, 2009 WL
1708826, at *9B11; Fitts, 982 S.W.2d at
185B87.  We cannot say that the evidence is so weak
that the jury=s determination was clearly
wrong or manifestly unjust or that the conflicting evidence so greatly
outweighs the evidence supporting the conviction that the jury=s
determination is manifestly unjust.  See
Lancon, 253 S.W.3d at 704; Watson, 204 S.W.3d at 414B15,
417.  We therefore hold that the evidence
was factually sufficient to support the jury=s
verdict.  We overrule Rhonda=s
seventh point.  

V.     Motion to Suppress

In her
first point, Rhonda contends the trial court erred by denying her motion to
suppress evidence seized during a warrantless search of her home.  On October 16, 2003, investigators conducted
char analysis and took photographs of the Orrs= home
without a search warrant.  The trial
court conducted a pretrial hearing on Rhonda=s motion
to suppress to consider whether investigators had actual or apparent authority
to search the home on October 16, 2003. 
The State argued at the pretrial hearing and contends on appeal that
James=s
parents, the Pooles, consented to the search and had actual or apparent
authority to give valid consent.  The
trial court ruled that the Pooles had actual and apparent authority to give
valid consent. 

 








A.     Standard of Review








We
review a trial court=s ruling on a motion to suppress
evidence under a bifurcated standard of review. 
Amador v. State, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); Guzman
v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court=s
decision, we do not engage in our own factual review.  Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990); Best v. State, 118 S.W.3d 857, 861 (Tex. App.CFort
Worth 2003, no pet.).  The trial judge is
the sole trier of fact and judge of the credibility of the  witnesses and the weight to be given their
testimony.  Wiede v. State, 214
S.W.3d 17, 24B25 (Tex. Crim. App. 2007); State
v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), modified on other
grounds by State v. Cullen, 195 S.W.3d 696 (Tex. Crim. App. 2006).  Therefore, we give almost total deference to
the trial court=s rulings on (1) questions of
historical fact, even if the trial court=s determination
of those facts was not based on an evaluation of credibility and demeanor, and
(2) application‑of‑law‑to‑fact questions that turn on
an evaluation of credibility and demeanor. 
Amador, 221 S.W.3d at 673; Montanez v. State, 195 S.W.3d
101, 108B09 (Tex.
Crim. App. 2006); Johnson v. State, 68 S.W.3d 644, 652B53 (Tex.
Crim. App. 2002).  But when
application-of-law-to-fact questions do not turn on the credibility and demeanor
of the witnesses, we review the trial court=s
rulings on those questions de novo.  Amador,
221 S.W.3d at 673; Estrada v. State, 154 S.W.3d 604, 607 (Tex. Crim.
App. 2005); Johnson, 68 S.W.3d at 652B53.

Stated
another way, when reviewing the trial court=s ruling
on a motion to suppress, we must view the evidence in the light most favorable
to the trial court=s ruling.  Wiede, 214 S.W.3d at 24; State v.
Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  When the record is silent on the reasons for
the trial court=s ruling, or when there are no
explicit fact findings and neither party timely requested findings and
conclusions from the trial court, we imply the necessary fact findings that
would support the trial court=s ruling
if the evidence, viewed in the light most favorable to the trial court=s
ruling, supports those findings.  State
v. Garcia-Cantu, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); see
Wiede, 214 S.W.3d at 25.  We then
review the trial court=s legal ruling de novo unless
the implied fact findings supported by the record are also dispositive of the
legal ruling.  Kelly, 204 S.W.3d
at 819.  

B.     Consensual Searches








Consent
to a search is an established exception to the constitutional warrant and
probable cause requirements.  Schneckloth v. Bustamonte, 412 U.S. 218,
219, 93 S. Ct. 2041, 2043B44 (1973); Carmouche v. State,
10 S.W.3d 323, 331 (Tex. Crim. App. 2000). 
AThe
validity of an alleged consent to search is a question of fact to be determined
from all the circumstances.@  Maxwell v. State, 73 S.W.3d 278, 281
(Tex. Crim. App. 2002) (quoting Ohio v. Robinette, 519 U.S. 33, 40, 117
S. Ct. 417, 421 (1996)).  The State must
prove valid consent by clear and convincing evidence.  Id. 

A
warrantless search by law enforcement officers does not violate the Fourth
Amendment=s protection against
unreasonable searches and seizures if the officers obtained the consent of Aa third
party who possessed common authority over or other sufficient relationship to
the premises or effects sought to be inspected.@  United States v. Matlock, 415
U.S. 164, 171B72, 94 S. Ct. 988, 993 (1974); see
Illinois v. Rodriguez, 497 U.S. 177, 179B82, 110
S. Ct. 2793, 2796B97 (1990).  Third-party consent rests not on the laws of
property but on Amutual use of the property by
persons generally having joint access or control for most purposes, so that it
is reasonable to recognize that any of the co-inhabitants has the right to
permit the inspection in his own right.@  Matlock, 415 U.S. at 171 n.7, 94 S.
Ct. at 993 n.7; see also Maxwell, 73 S.W.3d at 281 (stating a legal
property interest is not dispositive in determining whether a third party has
the authority to consent to a search). 

C.     Analysis








The
trial court correctly concluded the Pooles had actual authority to consent to
the search of the house on October 16, 2003. 
In considering whether the Pooles had the authority to consent, we look
to whether they had joint access or control over the house for most purposes so
that it would be reasonable to conclude they had the right to consent and that
Rhonda assumed the risk they might do so. 
See Welch v. State, 93 S.W.3d 50, 52 (Tex. Crim. App.
2002).  Access and control for Amost
purposes@ is
unique in this case because the house was damaged by fire and uninhabited at
the time of the search.








In this
case, the trial court heard evidence at the pretrial hearing on the motion to
suppress that before the fire, Mrs. Poole typically entered the house unannounced
and uninvited when no one else was there and Rhonda never complained or told
her not to do so; that Mr. Poole met the officers at the house and let them in
on the day of the search; that the Pooles provided the money for the down
payment and made all of the mortgage payments on the house; and that Rhonda
knew the Pooles always had a key to the house. 
There was also evidence that, after the fire, Rhonda moved to Dallas to
live with her mother, did not want to be near the house, and did not live in
the house again after the fire; that Mrs. Poole entered the house two or three
times to retrieve various items such as photos and mailConce at
Rhonda=s
request; that Rhonda asked Mrs. Poole to let the fire marshal, insurance
investigators, and a cleaning company into the house, that Mr. Poole let them
in, and that Rhonda never complained about it; that a neighbor called Mrs.
Poole when something needed to be repaired at the house; and that Mr. Poole
felt he had Rhonda=s permission to let anyone into
the house.  The trial court also heard
testimony from Rhonda and her mother that Rhonda did not give anyone permission
to enter the house and that Rhonda told Mrs. Poole a week after the fire not to
enter the house without Rhonda=s
permission.  








A third
party may give valid consent to search when that person Ahas
equal control over and authority to use the premises being searched,@ Maxwell,
73 S.W.3d at 281 (citing Matlock, 415 U.S. at 171, 94 S. Ct. at 993),
and the trial court could conclude by clear and convincing evidence that the
Pooles had the right to consent.  After
the fire, no one lived in the house, the Pooles assumed the maintenance of the
house, Rhonda did not want to be near the house, and Rhonda asked the Pooles to
give investigators access to the house, making the Pooles her agent in that
regard.  See Gabriel v. State, 290
S.W.3d 426, 434 (Tex. App.CHouston
[14th Dist.] 2009, no pet.) (holding agency agreement allowing mailing center
to accept mail for mailbox customer gave mailing center authority to consent to
search of customer=s mailbox).  Although the testimony by Rhonda and her
mother contradicted the Pooles= testimony,
we must defer to the trial court=s
resolution of those conflicts.  See
Amador, 221 S.W.3d at 673; Wiede, 214 S.W.3d at 24B25.  We hold the trial court did not err by
denying Rhonda=s motion to suppress.  We overrule Rhonda=s first
point.

VI.    Admission of State=s Arson
Expert=s Testimony

Rhonda
argues in her second point that the trial court erred by admitting the
testimony of the State=s fire investigation expert, Ray
Powell, because Powell was not licensed to conduct fire investigations in
Texas.

Texas
Code of Criminal Procedure article 38.23 provides that no evidence obtained by
an officer or other person in violation of the laws or constitutions of Texas
or the United States shall be admitted in evidence against the accused on the
trial of any case.  Tex. Code Crim. Proc.
Ann. art. 38.23(a) (Vernon 2005). 
Although article 38.23 seems to require exclusion of evidence tainted by
every violation of Texas law, not every violation of law triggers article 38.23=s
exclusionary effect.  Miles v. State,
194 S.W.3d 523, 528 (Tex. App.CHouston
[14th Dist.] 2006), aff=d, 241
S.W.3d 28 (Tex. Crim. App. 2007). 
Instead, article 38.23's primary purpose is to deter unlawful actions
that violate the rights of criminal suspects. 
Carroll v. State, 911 S.W.2d 210, 221 (Tex. App.CAustin
1995, no pet.) (citing Roy v. State, 608 S.W.2d 645, 651 (Tex. Crim.
App. 1980)).








A
defendant has no standing to complain about evidence seized in violation of
Texas law unless the defendant=s rights
were invaded by the seizure.  Chavez
v. State, 9 S.W.3d 817, 819 (Tex. Crim. App. 2000) (citing Fuller v.
State, 829 S.W.2d 191, 201B02 (Tex.
Crim. App. 1992), cert. denied, 508 U.S. 941 (1993), overruled on
other grounds by Riley v. State, 889 S.W.2d 290, 301 (Tex. Crim. App.
1993)).  

Rhonda=s
contention that Powell=s testimony was not admissible
because Powell was not licensed to conduct fire investigations in Texas is
analogous to the defendants=
arguments in Chavez and Fuller. 
See Chavez, 9 S.W.3d at 819; Fuller, 829 S.W.2d at 201B02.  In Chavez, a police officer authorized
by an agreement between several counties to investigate controlled-substance
violations in the participating counties made an undercover cocaine buy from
Chavez in a county that was not a party to the agreement.  9 S.W.3d at 818.  Chavez argued the cocaine should have been
suppressed under article 38.23 because the officer had no authority to act in
the county where he made the buy.  Id.  The court of criminal appeals emphasized that
Chavez claimed the cocaine should have been suppressed Asolely because
[the officer] obtained it from her outside the geographical boundaries set out
in the Agreement. [Chavez] alleged no violation of any of her rights.@  Id. 
The court rejected Chavez=s
argument, holding that only the parties to the agreement had standing to
complain about the breach of the agreement. 
Id. at 819.








In Fuller,
the court of criminal appeals similarly held that article 38.23 did not require
suppression of an incriminating audiotape that Fuller had given to a fellow
inmate, that was stolen by a third inmate, and that was given to prison
officials.  829 S.W.2d at 201B02.  The court held the theft of the tape by the
third inmate from the second inmate did not violate any of Fuller=s
rights; thus, Fuller did not have standing to complain about the theft, and
article 38.23 did not require the tape=s
exclusion.  Id. at 202.

The
statutes implicated in this case are Texas Occupations Code sections 1702.101
and 1702.104(D); they prohibit a person from conducting an investigation into,
among other things, the cause or responsibility for a fire unless the person
holds an investigations company license. 
Tex. Occ. Code '' 1702.101, 1702.104(D) (Vernon
2004).  A person who is not licensed
under chapter 1702 or who does not have a license application pending and who
violates chapter 1702 may be assessed a civil penalty of $10,000 per violation,
payable to the State.  Id. '
1702.381(a) (Vernon 2004).  It is
undisputed that Powell did not hold such a license in October 2003 when he
conducted his investigation at the house. 








Like the
defendant in Chavez, Rhonda argues the trial court should have
suppressed Powell=s testimony under article 38.23 solely
because Powell did not have an investigator=s
license.  See Chavez, 9
S.W.3d at 818.  Rhonda alleged no
violation of any of her rights in the trial court, and she argues no
such violation in this court.  See id.  Assuming Powell violated chapter 1702, the
appropriate remedy is a civil fine payable to the State, not the exclusion of
his testimony under article 38.23. 
Therefore, Rhonda lacks standing to challenge Powell=s
testimony under article 38.23.  See
id.; Fuller, 829 S.W.2d at 202. 
We hold the trial court did not err by overruling Rhonda=s
article 38.23 objection, and we overrule Rhonda=s second
point.  

VII.   Admission of Autopsy Photos

In her
third point, Rhonda argues the trial court abused its discretion by admitting
into evidence photos taken by the medical examiner during James=s
autopsy over Rhonda=s relevance and unfair-prejudice
objections.   








The
admissibility of photographs is within the sound discretion of the trial
court.  Rayford v. State, 125
S.W.3d 521, 529 (Tex. Crim. App. 2003), cert. denied, 543 U.S. 823
(2004).  AVisual
evidence accompanying testimony is most persuasive and often gives the fact
finder a point of comparison against which to test the credibility of the
witness and the validity of his conclusions.@  Chamberlain v. State, 998 S.W.2d 230,
237 (Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082 (2000).  Rule 403 provides that even relevant evidence
may be excluded Aif its probative value is
substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury.@  Id.; see Tex. R. Evid.
403.  Rule 403 favors admissibility and Acarries
a presumption that relevant evidence will be more probative than prejudicial.@  Hayes v. State, 85 S.W.3d 809, 815
(Tex. Crim. App. 2002).  

In
reviewing a trial court=s ruling on the admissibility of
photographs, we consider several factors, including the number and size of the
photographs, whether they are black and white or color, the gruesomeness, the
detail shown, and Awhether the body has been
altered since the crime in some way that might enhance the gruesomeness of the
photograph[s] to the appellant=s
detriment.@ 
Shuffield v. State, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006), cert.
denied, 549 U.S. 1056 (2006). 
Autopsy photographs are generally admissible unless they depict
mutilation caused by the autopsy itself. 
Hayes, 85 S.W.3d at 816.  

Dr. Gary
Sisler of the Tarrant County Medical Examiner=s Office
testified that James died from smoke inhalation and burns to eighty percent of
his body. The State offered four photographs of James=s body
through Dr. Sisler.  The photographs in
the record are four inches by six inches in size and show extensive burn
injuries on James=s face, torso, and limbs.  There are no visible incisions from an
autopsy examination; the only reference in the photos to the autopsy is the
presence of a ruler bearing a date and case number. 








In Shuffield,
the court of criminal appeals held the trial court did not abuse its discretion
by admitting victim photographs that showed only the injuries the victim
received, close-up views of the victim=s
wounds, and a ruler to show the size of the injuries.  Id. at 787B88.  The pictures were three-and-one-half by five
inches and black and white, but the court assumed color pictures were shown to
the jury.  Id. at 787.  The court noted the pictures were no more
gruesome than the crime scene as found by the police or than would be expected
from the type of injury the victim suffered. 
Id.  

Even
assuming the jury in this case saw color photographs of James=s body
as it looked at the time of the autopsy, there were only four moderately-sized
photographs, and the photographs are probative to depict the injuries James
received as a result of the fire; moreover, they do not depict any mutilation
caused by the autopsy.  See id. at
787B88.  The photographs are no more gruesome than
would be expected from burn injuries over eighty percent of a person=s body,
and they corroborated Dr. Sisler=s
testimony to that effect.  See id.;
Chamberlain, 998 S.W.2d at 237. 
We hold the trial court did not abuse its discretion by admitting the
photographs.  We overrule Rhonda=s third
point. 

 

 








VIII.   Prosecutor=s
Closing Argument

Rhonda
contends in her fourth point that the trial court erred by not sustaining her
objection to the State=s closing argument.  The prosecutor argued to the jury that Rhonda
told her daughter to lie to the police and say James was drinking alcohol and
intoxicated on the night of the fire.   

To be
permissible, the State=s jury argument must fall within
one of the following four general areas: (1) summation of the evidence; (2)
reasonable deduction from the evidence; (3) answer to argument of opposing
counsel; or (4) plea for law enforcement.  Felder v. State, 848 S.W.2d 85, 94B95 (Tex.
Crim. App. 1992), cert. denied, 510 U.S. 829 (1993); Alejandro v.
State, 493 S.W.2d 230, 231B32 (Tex.
Crim. App. 1973).








At
trial, the trial court admitted into evidence a videotape of an interview
between Ranger Murphree and Rhonda, and the State played the tape to the
jury.  On the tape, Ranger Murphree told
Rhonda that her daughter said that James did not wheel through the living room
and say he was Atoasted@ and
that her mom asked her to lie about the incident.  Ranger Murphree told Rhonda that her daughter
was writing a statement; later, he left the room and returned with a piece of
paper, showed it to Rhonda, and asked her if she recognized the writing on
it.  Ranger Murphree then read from the
paper, AHe didn=t drink
that night; my Mom told me to say that.@  Rhonda said that it looked like her daughter=s
handwriting but that she did not Acoach@ her
daughter to say anything. 

In
closing argument, the prosecutor argued as follows:

And then continuing on with the lies that she told in this case.  Her own daughter, a 10-year-old, she tried to
get her to lie to the police.  And she
told her daughter to tell the police that Jimmy was drinking.  You may recall on the tape that [Rhonda] says
that Jimmy was wheeling through the living room that night saying he was
toasted, that he had been drinking. 
Amanda told the police -- 

 

At that point, Rhonda objected
to the argument as outside the record. 
The trial court overruled the objection but instructed the jury that it
had heard all of the evidence and could recall whatever evidence was brought to
its attention. 








Although
no witness explicitly testified that Rhonda=s
daughter said that Rhonda told her to lie and say that James was intoxicated on
the night of the fire, the jury did watch the videotaped interview in which
Ranger Murphree confronted Rhonda with, and read from, her daughter=s
written statement.[10]  The prosecutor=s
argument was thus a reasonable deduction from and summation of the evidence,
and the trial court did not err by overruling Rhonda=s
objection to the argument.  See Felder,
848 S.W.2d at 94B95 (holding argument a
reasonable deduction from the evidence where medical examiner testified Abrain
death occurs when there is no brain activity or control,@ the
medical records in evidence indicated victim had Ano
cerebral activity,@ and prosecutor argued the
victim was brain dead).  We overrule
Rhonda=s fourth
point. 

IX.    Prosecutor=s
Question Regarding Abortion

In her
fifth point, Rhonda argues the trial court erred by overruling her
punishment-phase motion for mistrial after the prosecutor asked Rhonda=s mother
when Rhonda aborted the child with whom she was pregnant at the time of the
fire.  Rhonda objected to the question as
irrelevant and highly prejudicial.  The
trial court sustained the objection and instructed the jury to disregard the
question, but the trial court overruled Rhonda=s motion
for a mistrial.  

A.     Standard of Review








We
review a trial court=s denial of a motion for
mistrial under an abuse of discretion standard and Amust
uphold the trial court=s ruling if it was within the
zone of reasonable disagreement.@  Archie v. State, 221 S.W.3d 695, 699
(Tex. Crim. App. 2007) (citing Wead v. State, 129 S.W.3d 126, 129 (Tex.
Crim. App. 2004)).  AOnly in
extreme circumstances where the prejudice is incurable, will a mistrial be
required.@ 
Hawkins v. State, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).  A mistrial is appropriate only for a narrow
class of highly prejudicial and incurable errors and may be used to end trial
proceedings when the error is Aso
prejudicial that expenditure of further time and expense would be wasteful and
futile.@  Id. (quoting Ladd v. State, 3
S.W.3d 547, 567 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1070
(2000)).

AThe
asking of an improper question will seldom call for a mistrial, because, in
most cases, any harm can be cured by an instruction to disregard.@  Ladd, 3 S.W.3d at 567.  We presume the jury followed the trial court=s
instruction to disregard in the absence of evidence that it did not.  See Colburn v. State, 966
S.W.2d 511, 520 (Tex. Crim. App. 1998); Waldo v. State, 746 S.W.2d 750,
754 (Tex. Crim. App. 1988).  AA
mistrial is required only when the improper question is clearly prejudicial to
the defendant and is of such character as to suggest the impossibility of
withdrawing the impression produced on the minds of the jurors.@  Ladd, 3 S.W.3d at 567. 

B.     Analysis








A trial
court must balance three factors in deciding whether to grant a motion for
mistrial: (1) the severity of the misconduct (magnitude of the prejudicial
effect), (2) the effectiveness of the curative measures adopted, and (3) the
certainty of the punishment assessed absent the misconduct (likelihood of the
same punishment).  Hawkins, 135
S.W.3d at 77 (citing Martinez v. State, 17 S.W.3d 677, 693B94 (Tex.
Crim. App. 2000)); see Archie, 221 S.W.3d at 700.[11]

The
Tyler Court of Appeals applied the Mosley factors in Carnes v. State,
and although Carnes moved for a mistrial during the guilt-innocence phase of
his trial, we find the court=s
reasoning instructive.  See No.
12-06-00251-CR, 2007 WL 2178564, at *2 (Tex. App.CTyler
July 31, 2007, pet. ref=d) (mem. op., not designated for
publication).  During Carnes=s felony
sexual assault trial, the trial court sustained Carnes=s
objection but denied his motion for mistrial where the investigating officer
testified he located Carnes=s
current photograph after he Afound
that [Carnes] was listed as a sexual offender.@  Id. at *1.  The court of appeals analyzed the first and
second Mosley factors as follows:

The improper information that made its way into this jury trial was
powerful.  Appellant was on trial for
sexual assault and one of the State=s witnesses volunteered that he was Alisted as a sex offender.@ 

. . . .








The prejudicial effect is
high. Although it was a single brief reference, the jury was told that
Appellant was a sex offender, and he was on trial for sexual assault. The
curative measures were immediate and direct. The trial court told the jury not
to consider the inappropriate answer in any way.

 

Id. at
*2.  Analyzing the third Mosley
factor, the court recognized that credibility determinations were central in
the case and that the certainty of the conviction could not be determined from
the Acold
record.@  Id. 
However, the court noted the trial court was in the best position to
make the necessary determinations.  Id.
at *3.  The court then held that the
trial court did not abuse its discretion because the court could not conclude
that the trial court=s decision to deny the motion
for mistrial fell outside the zone of reasonable disagreement.  Id.

As in Carnes,
we cannot say the trial court abused its discretion in concluding its
instruction to disregard the improper question cured the error.  See id. at *2B3.  The prejudicial effect of the question
concerning Rhonda=s alleged abortion was high, but
the trial court correctly sustained Rhonda=s
objection and quickly instructed the jury to Adisregard
the last question by the prosecutor.@ 








In the
absence of evidence that it did not, we presume the jury followed the trial
court=s
instruction to disregard the improper question. 
See Colburn, 966 S.W.2d at 520. 
The trial court orally instructed the jury to disregard the improper
question, and the court=s charge instructed the jury
that, for sustained objections, the jury could not Aconjecture
as to what the answer might have been or as to the reason for the objection.@ 

Rhonda
contends her eighty-eight year sentence suggests the jury did not follow the
trial court=s instruction because Rhonda was
eligible for probation and because the jury heard no evidence of her prior
criminal history.  We disagree.  The punishment range for first degree
felonies is five to ninety-nine years or life. 
See Tex. Penal Code Ann. ' 12.32
(Vernon 2003).  And A>the
sentencer=s discretion to impose any punishment
within the prescribed range is essentially unfettered,= and . .
. a punishment that falls within the legislatively prescribed range, and that
is based upon the sentencer=s
informed normative judgment, is unassailable on appeal.=@  Franco v. State, No. 08-06-00280-CR,
2007 WL 2200468, at *5 (Tex. App.CEl Paso
Aug. 2, 2007, pet. ref=d) (not designated for
publication) (quoting Ex parte Chavez, 213 S.W.3d 320, 323B24 (Tex.
Crim. App. 2006) (considering length of sentence when analyzing Mosley
factors)).  








Rhonda=s
sentence is within the prescribed range of punishment and is less than the life
sentence the State requested.  See
Tex. Penal Code Ann. ' 12.32.  There was abundant evidence by which a jury
could have found Rhonda deserving of the sentence that she received; the jury
found Rhonda guilty of starting a fire (that caused her husband=s death)
with the intent to destroy or damage the house. 
See id. ' 28.02(a)(2)(A), (d)(1).  This alone could be sufficient for the
sentence Rhonda received.  Given that the
jury had considerable latitude in assessing punishment, and in fact assessed
punishment within the statutory range for Rhonda=s first
degree felony, we cannot conclude the jury did not follow the trial court=s
instruction to disregard the improper question. 
See Franco, 2007 WL 2200468, at *5.  

The
trial court correctly sustained Rhonda=s
objection and quickly instructed the jury to disregard the improper
question.  Under the circumstances of
this case, we cannot conclude the trial court=s
decision to deny Rhonda=s motion for mistrial fell
outside the zone of reasonable disagreement. 
See Carnes, 2007 WL 2178564 at *2B3.  Therefore, we hold the trial court did not
abuse its discretion in denying Rhonda=s motion
for mistrial.  We overrule Rhonda=s fifth
point.

X.     AReasonable Doubt@ Jury
Charge

Rhonda
contends in her sixth point that the trial court made a misstatement of law
concerning the definition of reasonable doubt in its jury charge.  The trial court overruled Rhonda=s
objection to the following instruction in the court=s charge
to the jury: AIt is not required that the
prosecution proves guilt beyond all possible doubt.  It is required that the prosecution=s proof
excludes all >reasonable doubt=
concerning the defendant=s guilt.@  








We have
previously addressed the propriety of this particular jury instruction on
several occasions and have held that the trial court=s use of
this instruction was not improper.  See,
e.g., Gulley v. State, No. 02-06-00395-CR, 2008 WL 755203, at *6
(Tex. App.CFort Worth Mar. 20, 2008, pet.
ref=d) (mem.
op., not designated for publication); Pope v. State, 161 S.W.3d 114, 125
(Tex. App.CFort Worth 2004), aff=d, 207
S.W.3d 352 (2006); Best, 118 S.W.3d at 865 (holding that merely giving a
reasonable doubt definition in a jury charge does not constitute reversible
error and that the trial court did not err by submitting a jury charge
distinguishing reasonable doubt from possible doubt).  Accordingly, we hold that the instruction
given was not improper.  We overrule
Rhonda=s sixth
point.          

XI.    Conclusion

Having
overruled Rhonda=s seven points, we affirm the
judgment of the trial court.  

 

 

ANNE GARDNER

JUSTICE

 

PANEL:  LIVINGSTON, DAUPHINOT,
and GARDNER, JJ.

 

DAUPHINOT, J. filed a concurring opinion.

 

PUBLISH

 

DELIVERED:  February 18, 2010











 
 
 
 
 
 
 




 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                       NO.  2-08-143-CR

 

 

RHONDA ORR                                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 362ND DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                  CONCURRING OPINION

 

                                              ------------








I concur
in the ultimate outcome, but I write separately in regard to Appellant=s second
point.  When the police directly or
indirectly obtain evidence by violating the law, the evidence must be
suppressed.[12]  But the police did not engage the services of
an unlicensed person to act as an arson investigator.[13]  Further, Powell did not violate the statute.[14]

The
evidence shows that Ms. Poole hired investigator R.D. King, the father of her husband=s nephew=s wife,
to investigate her son=s death.  In response to a call from King, Powell went
to the fire scene and met with Mr. Poole. 
He walked through the house and did analyses to try to determine the
cause and source of the fire.  Before
that, he had met with fire marshals Wallace and Bowery and examined photographs
of the fire scene, concluding that two separate fires had been burning in the
room at about the same time.  In both
instances, Powell simply provided his expertise to help persons lawfully
investigating the fire to understand what they were seeing.








I would
hold that Powell was not engaged in the investigation business in violation of
the statute.[15]  He was a retired Florida deputy fire marshal,
and employed as a teacher at the time of his assistance, who provided his
expertise to both the fire marshals and to the investigator hired by Ms.
Poole.  As such, he was not working as an
investigator as contemplated by the statute.[16]  Powell=s role
was similar to that of a serologist who performs blood tests to assist the
police in investigating a possible criminal offense, and it was similar to that
of an art expert who assists the police in determining whether a painting is
authentic or a fake.  Such experts are
not required to be licensed investigators or law enforcement officers.  They provide their expertise to assist law
enforcement or licensed investigators, and there may be other licensing
requirements peculiar to their field of expertise that would go to their qualification
as an expert.  But providing expertise to
an investigator does not make a person an investigator and does not mean that
person is engaged in the investigation business.

With
these observations, I concur in the majority=s
thoughtful opinion.

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PUBLISH

DELIVERED:  February 18, 2010











[1]The offense of arson is a
first-degree felony if a person suffers bodily injury or death Aby reason of the
commission of the offense.@  Tex.
Penal Code Ann. ' 28.02(a)(2)(A),
(d)(1) (Vernon 2003).





[2]Officer Miller worked
eight years as a police officer with the cities of North Richland Hills and
Little Elm.  He left the Little Elm
Police Department in February 2004 to work for the United States State
Department.  At the time of trial,
Officer Miller worked for the State Department in Diplomatic Security Services.





[3]Officer Miller said he
noticed a strong concentration of flames around the far side of the bed and at
both night stands.  He also said he found
a wheelchair in the room, close to the door, and eighteen inches to two feet
from the bed.





[4]Amanda is Rhonda=s daughter but James is
not Amanda=s father.





[5]Ranger Murphree
acknowledged that he threatened capital murder charges at the end of his
interview of Rhonda and that he believed he had probable cause for her arrest
on that charge but that such a charge was never filed. 





[6]Margaret Corn, Fire
Marshal for the City of Little Elm at the time of the fire, testified she
participated in the investigation of the scene on the morning of the fire while
the cleanup was still in progress.  She
testified that she and another investigator found glass on the floor by the bed
that they believed was a portion of a Wild Turkey whiskey bottle. 





[7]Powell testified there
was a third point of origin in the bathroom as well.  When he revisited the house in May 2005,
sheetrock had been removed and the bedroom and bathroom had been cleaned for
reconstruction.  He found a burned area
inside the wall behind the bathtub; he did not see this area in 2003 because
the bathtub had not yet been removed. 
Powell said that he had determined that this area of fire had to have
been started by an ignitable liquid, possibly alcohol. 





[8]Keller admitted on
cross-examination, however, that the applicable investigation manual says many
things affect fire patterns, including ventilation and the type of wood, but
that the manual does not say fire patterns have no value.  Instead, the manual suggests the investigator
should be aware of and take into account any factors that might alter fire
patterns. 





[9]We note that Rhonda=s expert witness admitted
that he incorrectly identified the night stands and footboard in his report and
disregarded charring and burn patterns when the applicable manual instructs
otherwise.





[10]Rhonda objected to the
admission of the videotaped interview, but the trial court overruled her
objections, and Rhonda does not complain on appeal about the admission of the
videotaped interview. 





[11]Courts commonly refer to
these factors as the AMosley factors@ and apply them to
motions for mistrial in both the guilt-innocence and punishment phases.  See Archie, 221 S.W.3d at 700; Hawkins,
135 S.W.3d at 77; Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App.
1998), cert. denied, 526 U.S. 1070 (1999).  At the guilt-innocence phase, the third Mosley
factor involves the certainty of conviction rather than the certainty of the
punishment assessed.  See Archie,
221 S.W.3d at 700; Mosley, 983 S.W.2d at 259.





[12]Tex. Code Crim. Proc.
Ann. art. 38.23 (Vernon 2005).





[13]See Tex. Occ. Code Ann. ' 1702.101 (Vernon
2004).





[14]See id.





[15]See id.





[16]See id.















 [CB1]

Majority by Gardner;
Dauphinot Concurrs in result.